Earle Estate.

Argued November 20, 1951.   Before Drew, C. J., Stern, Stearne, Ladner and Chidsey, JJ.

reargument refused January 14, 1952.

*C. Brewster Rhoads,* appellant, in propria persona, with him *Joseph W. Swain, Jr.* and *Montgomery, Mc-Cracken, Walker & Rhoads.*

*John B. Gest,* with him *Frank Rogers Donahue* and *Donahue, Irwin & Gest,* for appellee.

OPINION BY MR. JUSTICE LADNER, December 27, 1951:

George H. Earle, Jr., died February 19, 1928, leaving a will dated January 24, 1928. In that will he provided by the third paragraph of the Fifth Item of his will as follows: "In the event that my estate, after the payment of taxes, shall at least amount to the net sum of Five Million ($5,000,000) Dollars or over, I give and bequeath to my Trustees in Trust for the benefit of each and every male child of my sons who shall by birth inherit and bear the name of Earle, the sum of One Hundred Thousand ($100,000) Dollars for each one of such male children. Said sum shall be held in Trust upon the same terms, conditions and uses as provided in ITEM THIRD in the trust for the benefit of my granddaughter LOUISE DILWORTH BEGGS, and in ITEM FOURTH in trust for the benefit of my granddaughter EDITH EARLE LEE."

The reference to the other items of the will makes clear that only the *income* not the principal is given to these grandsons.

The sole question before us on these appeals[1] is

---

[1] Two appeals were taken in this case. Appeal 263 was taken from the decree of the Orphans' Court dated June 15, 1951, dismissing exceptions and confirming the adjudication. Appeal 264 was taken from the decree approving the schedule of distribution dated August 22, 1951. Both appeals are timely. Counsel for appellant explains that as the adjudication did not *direct* a schedule of distribution, he took the first appeal from the order confirming the adjudication. Later a schedule of distribution was presented by counsel for accountant which the Auditing Judge accepted and approved. Out of a proper precaution a second appeal was then taken from the schedule thus approved: see *Graham's Estate,* 294 Pa. 493, 144 A. 427 (1928); *Levy's Estate,* 307 Pa. 522,

whether Anthony Wayne Earle, who was born July 11, 1949, i.e., *after* the testator's death, is entitled to have a $100,000 trust set up for him in accordance with the paragraph quoted.

At the audit of the Trustees' Third Account such application was made on behalf of the minor by C. Brewster Rhoads, Esq., as guardian ad litem appointed by the Auditing Judge to protect the minor's interest. It was opposed by Frank Rodgers Donahue, Esq., appointed by the Auditing Judge to represent all minor and unascertained remainder interests of the trust estate which comprises the whole residuary estate.

The learned Auditing Judge refused the application, holding that the provision of the will in question must be so construed as to *exclude* grandsons born *after* testator's death, which ruling was confirmed on exceptions by the court en banc, Judge BOLGER dissenting.

With all due deference to the learned judges of the court below, who are distinguished in their respective branch of the law, we must conclude they erred and the decree appealed from must be reversed.

It is well settled that the intention of a testator is the polar star in the construction of wills: *Sarver's Es-*

---

161 A. 740 (1932) ; *Whitmore's Estate*, 20 D. & C. 432 (1934) ; 1 *Hunter's Common Place Book*, p. 54. The uncertainty as to what order to appeal from in such circumstances may be set at rest by the new Orphans' Court Act of 1951, effective January 1, 1952 (Act No. 263, approved August 10, 1951, Sec. 771) which provides: "Any party in interest who is aggrieved by a final order or decree of the orphans' court, or a fiduciary whose estate or trust is so aggrieved, may appeal therefrom to the proper appellate court. An appeal in like manner may be taken from a *decree of distribution* of the orphans' court which is not final within the meaning of this section, provided the orphans' court shall certify that the decree is sufficiently definite to determine the substantial issues between the parties." But the language used in that section is not too clear unless we read the words "decree of distribution" as synonymous with confirmed adjudication.

*tate,* 324 Pa. 349, 188 A. 141 (1936); *Prime's Petition,* 335 Pa. 218, 6 A. 2d 530 (1939); *Mulert Est.,* 360 Pa. 356, 61 A. 2d 841 (1948). Equally well settled is the corollary proposition that where the language used by the testator is plain and clearly discloses his intention, no rules of construction are necessary to arrive at an interpretation, a principle repeatedly emphasized by Mr. Justice (now Chief Justice) DREW in *Boyer v. Campbell,* 312 Pa. 460, 167 A. 284 (1933); *Haydon's Estate,* 334 Pa. 403, 6 A. 2d 581 (1939); *Brown Estate,* 349 Pa. 23, 36 A. 2d 335 (1944). And as held 'in the recent case of *Clark Est.,* 359 Pa. 411, 59 A. 2d 109 (1948), it is the actual intent, as ascertained from the language of the will that must prevail in the light of the circumstances surrounding testator at the date of the execution of the will. Hence it is our first duty to examine the will and if possible ascertain its meaning *without* reference to canons of construction. *Groninger's Estate,* 268 Pa. 184, 187, 110 A. 465 (1920); *Weir's Estate,* 307 Pa. 461, 467, 161 A. 730 (1932).

When we peruse the provision in question we see that the testator establishes a class composed of such of his grandsons as are born to his sons and defines the qualifications of members of that class explicitly by the words, "I give and bequeath . . . for the benefit of *each* and *every male* child of my *sons,* who *shall* by birth inherit and bear the name of Earle," etc. Analyzing this language it becomes clear that the phrase "each and every" is an emphatic way of saying "all" and can indicate only an intent that no son of his sons be excluded.

Next we note the testator adds to the phrase "each and every male child" the words *"of my sons,"* which indicates *all* male progeny of *both* sons are intended to be included. The use of the plural becomes more important when we view the extraneous circumstances of

the family situation from the testator's arm chair. (This, as pointed out by Mr. Justice ALLEN M. STEARNE in *Schmick Estate*, 349 Pa. 65, 70, 36 A. 2d 305 (1940), we must do. See also *Jackson's Estate*, 337 Pa. 561, 12 A. 2d 338 (1940) ; *McGlathery's Estate*, 311 Pa. 351, 166 A. 886 (1933)). The testator at the date of the will had two sons, George H. III, age 37 and married, who had three sons living at the date of the will and at the date of testator's death and one en ventre sa mere born thereafter on September 26, 1928, and Ralph Earle, 35 years of age, who though married had *no* children living at either the date of the will or of testator's death and none so far born since testator's death. Testator was on cordial terms with *both* of his sons for he designated both sons as co-trustees of the trust under his will. These circumstances confirm testator's intent to include any male offsprings of both of his sons whenever born. Certainly it is unthinkable that he intended to cut off sons of Ralph, his younger son, just because he had no sons *then.*

Significant also is the future tense indicated by the word "shall" in the phrase, "who *shall* by birth inherit and bear the name of Earle." To give effect to the future tense, it is reasonable to regard the testator's intent as including in the described class those born *after* his death as well as *before.*

It is equally clear that the motivating purpose that influenced these special bequests of income was pride in the family name and desire to have that name perpetuated by as many lineal male descendants of the *blood and name* as possible. To exclude grandsons that came within the described class merely because they happened to be born after the testator's death would do violence to the very purpose that actuated the gifts. To which may be added that normally if a testator has in mind individual members of a group he would de-

scribe them by name; therefore, when he uses a class designation he would seem to mean not only those known to him but all that may come into the class described unless there is some contrary intent manifested.

We have here then a clear case for the application of the principle referred to in *Witman v. Webner,* 351 Pa. 503, 41 A. 2d 686 (1945), where Mr. Justice HORACE STERN said, at page 507, "It is well settled that if a person qualifies within the exact meaning of language describing a class he will be held to be a member of that class unless other language in the instrument expressly or by clear implication indicates a contrary intent: Robison's Estate, 266 Pa. 251, 109 A. 924; Hogg's Estate, 329 Pa. 163, 196 A. 503; Rosengarten Estate, 349 Pa. 32, 39, 36 A. 2d 310, 313, 314."

We have examined the whole will to ascertain if there be any other language that impels such contrary intent and find nothing that compels a narrower construction of the testator's explicit language. In doing so we have been greatly assisted by the learned opinions of the three eminent judges of the court below and the excellent briefs of the able guardians ad litem. Our respect for the learned judges below requires us to examine the reasons advanced in the adjudication and the opinion of the court en banc which led the court below to a different conclusion.

Judge HUNTER in his adjudication begins by applying the general rule of construction known as "the rule of convenience" which he states as follows: "that in the case of an *immediate* gift to a class, the class closes as of the death of the testator." However, unless the word "immediate" is understood to mean a gift of principal distributable at the testator's death, the rule is too broadly stated because the rule must be applied with due regard to its origin. As the learned Auditing

Judge points out, this rule had its origin in the English case of *Ringrose v. Bramham,* 2 Cox 384, 30 Eng. Reprint 177 (1794), where the testator provided, "I also give to Joseph Ringrose's children £50 to every child he hath by his wife Elizabeth . . . I also give to Christopher Rhodes's children, that he hath by his wife Peggy, £50 to every child. . . ." The court there said: ". . . if I am to let in all the children of these two persons born at any future time, I must *postpone* the *distribution* of the testator's personal estate until the death of Joseph Ringrose and Christopher Rhodes, or their wives . . . until I know how many legacies of £50 are payable." (Italics supplied.) It must be remembered this was an executor's account and the rule there adopted solved the very practical difficulty of reserving a sufficient sum to meet the contingency of an unknown number of future births, or in the alternative withhold *all* distribution for an *indefinite* period from other distributees presently entitled. It is to be noted also that the words of this testator "children that he hath by his wife" were of equivocal import so that the rule there adopted was no doubt a proper solution.

However, the danger of such rules of construction is their tendency in the progress of time to become inflexible and in their application to circumstances where there is neither reason nor necessity until finally they become controlling. A familiar example of that eventuality is the Rule in *Shelley's Case,* which became so fixed that it more often thwarted a grantor or testator's intent than observed it.[2] The case of *Storrs v. Benbow,* 2 My. & K. 46, 39 Eng. Reprint 862 (1833), cited by

---

[2] In fact, such rule became so rigid in its application despite a testator's expressed intent that it has been abolished by statute. Act of July 15, 1935, P. L. 1013, 20 P.S. 229, now supplied by Act of April 24, 1947, P. L. 89, section 16, 20 P.S. 180.16; Act of April 24, 1947, P. L. 100, §17, 20 P.S. 301.17.

the Auditing Judge also illustrates this tendency. In that case testator gave ". . . the sum of £500 apiece to each child that *may be born* to either of the children of either of my brothers, lawfully begotten, etc. . . ." (Italics supplied.) It was held the class closed as of the death of the testator thus extending the rule of convenience to a case where the testator's words clearly indicated futurity. The decision seeks to explain away the words "may be born" by asserting these words would be satisfied by the period of time between the date of the will and the date of the death, yet this is no explanation at all because even *without* such words of futurity, children born between the date of the will and testator's death were always regarded as being within the class: 3 *Jarman on Wills,* 7th Ed. 1930, page 1669.

Therefore, we must be constantly alert to see that artificial rules of construction should be resorted to only where the intent of a testator as gleaned from his language is obscure, or where there is compelling practical necessity for their application; and when the reasons on which they are founded do not exist they ought not be applied. In this case the basic reason, which gave rise to the "rule of convenience" is *not* present. There is here no gift of principal to any member of the class in question that vested at testator's death. Aside from a few minor legacies given outright to nonmembers of the family by Item Second only *income* is given. No distribution is made of the principal to any family beneficiary and the whole of it is withheld until the date of the termination of the trust as hereinafter noted. Indeed, the learned Auditing Judge admits the reason giving rise to the rule does not here exist and frankly says, "If this testator intended that the executors pay $100,000 [income] legacies to grandsons living at his death, and that the trustees of residuary estate pay similar legacies to the afterborn, it must be admitted that there is no practical difficulty in so do-

ing. The residuary trust will remain intact until 'the expiration of twenty-one (21) years after the death of my (the testator's) last surviving grandchild or great-grandchild living at the time of my decease.' Distribution at the termination of the residuary trust will not be delayed, because it does not seem possible that the trust can terminate before the death of testator's two sons, when the class of grandsons will be complete." It therefore serves no purpose to restrict words of futurity of the gifts here made to the period between the date of the will and testator's death because when such restriction serves no purpose, words of futurity are not to be restricted to date of testator's *death* but are projected at least to the *date of distribution* and it was expressly so held in *Heisse v. Markland,* 2 Rawle 274 (1830), and *Austin's Estate,* 315 Pa. 449, 173 A. 278 (1934).

That the rule should not be applied when the reason therefor does not exist has been recognized by respectable authority as noted by text writers.[3] In *Mogg v. Mogg,* 1 Mer. 654, 35 Eng. Reprint 811 (1811), where a testator devised certain property in trust to pay rents toward the support and maintenance of "children begotten and to be begotten" of his daughter Sarah Mogg, it was held the class remained open so as to include five children born after the testator's death because the gift was an aggregate sum to the whole class and *did not delay distribution.* It should be noted that the restricted view of the words importing futurity, "children begotten and to be begotten" were not explained away by asserting they were satisfied by the period of time between the date of the will and the date of testator's death, thereby indicating that the

---

[3] See, for example those collected in the comprehensive article by Casner, entitled Class Gifts to Others Than to "Heirs" or "Next of Kin" Increase in Class Membership, 51 Harv. L. R. 254 (1937).

real basis and perhaps the only justification for the application of the "rule of convenience" is where it delays indefinitely distribution to other distributees. So, too, as pointed out by Judge BOLGER in his dissenting opinion, the Restatement of Property, Sec. 294, comment q, indicates that the rule need not be applied to close a class at testator's death when distribution is not actually delayed for the reasons therein set forth. This whether separate sums are given to each member of the class or an aggregate to the whole class: 2 Simes, Future Interests, 1936, Sec. 386, p. 151. The same view is held in *McLain v. Howald,* 120 Mich. 274, 79 N. W. 182 (1899); *Attorney General v. Crispin,* 1 Bro. C. C. 386, 28 Eng. Reprint 1192 (1784); *Parker v. Leach,* 66 N. H. 416 (1890); 3 *Jarman on Wills,* 7th Ed. 1640.

Judge BOLGER in his dissenting opinion calls attention to another exception to the application of the "rule of convenience," which is that when there are no members of the class in existence at the date of the will or of testator's death the rule is inapplicable. He then demonstrates that this exception might well be applied to the instant case for the testator cannot be presumed to have intended that his gift to the sons of Ralph should be a nullity as he well knew Ralph then had no sons. All of which is analogous to the recognized principle that a devise to children of a living person who has no children is an executory devise to children when born: *Hunter's Common Place Book,* p. 388, citing *Mitchell v. Long,* 80 Pa. 516 (1876) and *Leisenring's Estate,* 237 Pa. 60 (1912).

In justice to the learned Auditing Judge we should say it is evident from his adjudication that he does not rely with too much confidence on the rule of convenience for he concludes, "Aside from the question of the testator's intent, I agree with the claimant in his contention that there is no reason for applying the rule

of convenience, and that the class could remain open until the final termination of the residuary trust, without inconvenience to the estate."

He then proceeds to search the will for other light on testator's provision which he regards as ambiguous. While we have come to the conclusion that the provision in question is *not* ambiguous, we will proceed nevertheless to answer the other reasons advanced in the adjudication. It is argued that the establishment of the trust for an afterborn grandson is not consistent with the general plan of the will because his life estate under Item Fifth of the will may continue beyond the termination date of the residuary trust under Item Eleventh, the minor appellant being 20 years and 10 months younger than his youngest half brother. This argument assumes too much.

The *terms* of the $100,000 trusts for the male off-springs of testator's sons are not set out in paragraph 3 of Item Fifth which creates them, but by reference the terms and conditions of the two named granddaughter trusts set up in Item Third and Fourth are incorporated. Item Fourth is identical with Item Third under which the trust set up for the granddaughter, Louise, is stated to be, ". . . for the term of her life." Upon her death the trustees are to pay the income from this trust to her issue ". . . until the time for the distribution of the principal of my estate arrives, as fixed in ITEM ELEVENTH hereof." When the time arrives for the distribution of the principal of testator's estate, the principal of this trust is to be paid to the issue of Louise per stirpes. In the event that she should die without issue "her surviving," the principal of the trust falls back into the residuary estate.

As we understand the argument made by learned counsel for the appellee and accepted by the Auditing Judge it is, that in case of a trust for a grandson born in testator's lifetime such grandson cannot be living at

the date of the termination of the trust which must, under Item Eleventh, end 21 years after the life of the longest liver of testator's grandchildren or great grandchildren living at testator's death. But to give a grandson born *after* the *testator's* death a life estate would not only offend the rule against perpetuities but be inconsistent with the pattern of testator's will. However, as Judge BOLGER correctly points out in his dissenting opinion, this argument assumes that the trust for the two granddaughters fit in with the pattern of the will, whereas, in fact, they do not. This because Item Eleventh which fixes the date of the termination of the trust expressly excludes these two granddaughters as measuring lives as well as from participation[4] in the corpus of the residue, and passes the corpus of their trusts on to their issue in default of which it falls into the residue.

From this it follows that these two granddaughters not being measuring lives may survive the termination of the trust. Hence, what happens in such event poses a problem equally inconsistent with the pattern of the will. It shows also that testator failed to provide for that contingency, but such failure is no reason to deny the trusts for the granddaughters in face of the express language creating them. Neither does the fact that the testator failed to provide for the contingency of the after born grandson surviving by more than 21 years the last surviving measuring life of the trust furnish any reason for refusing to give due effect to the express language which standing alone is applicable to after born grandsons as well as those born in his lifetime. In other words, as said by Judge BOLGER, "The

---

[4] Except as to granddaughter Edith whom the testator's son, Ralph, adopted, if he appoints her to share as he is given the right to do under par. 3, Item Ninth of the will.

patterning of the gifts to grandsons . . . does not involve the question of whether an after born grandchild shall take, but only as to *how and to what extent* he shall take: Bowen's Estate, 139 Superior Ct. 523."

Nor is the possibility of the appellant minor living beyond the date of the trust termination a controlling factor, for if the estate, granted by reference, be treated as one per autre vie (measured by the granddaughters' lives) then there is no perpetuity. On the other hand, if treated as an estate for *his* life it would naturally be interpreted as an income for his life or *until the termination of the trust,* which interpretation easily avoids violation of the rule against perpetuities without denying him the benefit of his trust.

We need not speculate nor now pass on what may happen if the various contingencies occur that are mentioned as possibly affecting the ultimate disposition of the trusts to the two granddaughters or the trust to the appellant minor if any of them should survive the termination of the residuary trust. None of the contingencies may ever happen, but if any of them do, that situation can then be met in the light of circumstances then existing. For the present, it is sufficient to state none of these possibilities is any valid reason for refusing to give full effect to what we regard as unambiguous language of the provision which by description, clearly includes the after born grandson.

Turning now to the opinion of the court en banc, we observe the eminent jurist who wrote its opinion falls into the same error that runs through the adjudication. Disavowing the need to apply the rule of convenience, the opinion nevertheless begins by applying it, calling it the general rule which is stated to be, that where there is "any immediate gift to a class, the class closes as of the date of the testator's death." But as we hereinbefore observed, this rule can only be ap-

plied where the estate is *distributable* at the death.[5] This is because, as Chief Justice GIBSON says, "the *time of distribution* is, itself, a circumstance of paramount consideration"; (Italics supplied). *Heisse v. Markland,* 2 Rawle 274, 276 (1830), and see Judge GEST'S opinion, affirmed on appeal, in *Austin's Estate,* 315 Pa. 449, 453, 173 A. 278 (1934).

Of course the rationale of the opinion of the court en banc is that the time of distribution here was actually the date of the audit of the executor's account as evidenced by the award to the executors in their capacity of trustees. Technically such an award *is* a distribution but it is not the *kind* of distribution which warrants the application of the rule of convenience. What Judge ASHMAN stated in *Bonaffon's Estate,* 14 W. N. C. 501, 502 (1884), is peculiarly appropriate on this point. Said that learned jurist in dismissing exceptions to Judge PENROSE'S adjudication, "In a gift to children as a class, the law aims to postpone as far as possible the period of distribution, in order to bring within the scope of the testator's bounty the largest number of beneficiaries. But the rule has been broken, upon the ground of convenience, where a literal adherence to it would sacrifice the interests of living children to secure the possible rights of children who may yet be born."

In order to justify his taking the executor's audit as distribution date[6] for the application of the rule, the

---

[5] The controlling rule is more accurately stated as follows: "The general rule of construction adopted with respect to increase in the class membership is that the class will increase in size until the *period of distribution* but not after that time." (Italics supplied.) Casner, Increase in Class Membership, 51 Harv. L. R. 254. 260.

[6] While the court en banc states the applicable rule as being the class closed at the date of the *death*, the opinion treats this date as though it was the date of the *audit* of the executors' ac-

learned opinion writer for the court en banc felt it necessary to find some intent of the testator so indicating. Consequently he points out that the increase provisions for the named granddaughter trusts appearing in the first and second paragraphs of the same item (Fifth) each begin with the same condition as the paragraph 3 creating the grandson trusts, viz., "In the event my estate . . . shall at least amount to a net sum of 5 million." Since, proceeds the opinion, the time of the determination though not fixed must necessarily be at the audit of the executor's account, and not thereafter, so far as the first two paragraphs are concerned the testator must have so intended as to the third. Waiving aside the obvious answer that this does not necessarily follow because had the testator *not* repeated the same condition the gifts in the third paragraph would have been free of it, it is clear that if the testator in paragraph 3 had added (what we hold is clearly implied) the additional words, "whether born before my death or after," the fact that the increase of the granddaughter trusts was properly determinable at the time of the audit could not be held to overcome such words. Nor can that fact overcome the words which the testator actually used which we have demonstrated at the beginning of this opinion clearly imply the same thing.

In holding the real distribution date for the application of the rule to be the *distribution of principal* at the termination of the trust, we need not be concerned with the fancied disadvantages (recited in both the opinion and appellees' brief) that might arise if a later time than executors' audit were fixed for the fulfillment of the 5 million condition, e. g., such as the necessity of continuous reappraisement of the corpus, or

count. To regard the actual *date of death* as the controlling time would make the reasoning of the opinion inconsistent.

the possibility of its future diminution below that figure and thereby exclude some after born child or reduce the income of the widow and children of the testator. All these speculations are unimportant in face of the facts that testator's net estate was approximately ten million at the time of the executors' audit and at the present time is still over eight million.

But assuming the proper time when the 5 million condition must be fulfilled was at the audit of the executors' account and not thereafter, we still find no difficulty because that situation was fully met by Judge HENDERSON who audited the executors' account and who *expressly reserved the rights* of afterborn children against the estate awarded to the trustees. Though he did not think it necessary to decide that question, he took care, in effect, to charge any future claims of afterborn children on the fund awarded by him to the executors-trustees, thereby properly leaving the question to be decided if and when it might arise. In passing we note that counsel for the accountant at that audit was Mr., later, Justice BARNES, who had been testator's personal counsel and witnessed his will. His acquiescence is somewhat indicative of the fact that afterborn children were intended to be included, otherwise he would no doubt have had a guardian or trustee ad litem appointed for that audit and the question *then* settled.

The opinion finally suggests that in the first paragraph of the Ninth Item of his will the testator used the phrase, *either before my death or thereafter* and thereby demonstrated he knew how to so specify when that was his intent. This is usually a persuasive argument but it loses its force when we observe testator did not use that phrase in the second paragraph nor in the fourth, fifth, or sixth paragraphs of the same Item where it would have been equally appropriate; instead he seems to have relied on the plain implication of such words. So, too, it might also be answered by

pointing out that in Item Fifth the testator had already used the all inclusive words, ". . . each and every male child of my sons," which coupled with the words of futurity, "who *shall* by birth inherit and bear the name of Earle," made the additional words redundant. Judge BOLGER sets forth in his dissenting opinion other equally cogent reasons why the argument based on the omission of those words cannot prevail but which we find unnecessary to repeat.

To sum up our position briefly, we say that since the minor claimant here qualifies within the exact meaning of the language used in describing the class, he cannot be excluded by the application of a rule of construction which can only be invoked when it delays distribution beyond the time fixed in a will.

We conclude by saying that we have carefully read the entire will in the light of the learned opinions of the three judges of the court below and of the able arguments and briefs of the learned counsel and find nothing to shake the plain implication of the explicit words which bring the minor claimant within the class described by the testator. To hold otherwise would do violence not only to testator's unambiguous language but also to the clearly apparent motive, the sole reason for the gifts, namely, family pride and a desire to perpetuate an honored name.

We hold until the time fixed by the testator for the distribution of the corpus of his estate arrives, any son's male child born before that time who qualifies as a member of the class described in par. 3, of Item Fifth, cannot be excluded.

Decree reversed, costs to be paid out of the estate.

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I am unable to join in this opinion. It is an ancient well established canon of will construction that

where there is an immediate gift of *a separate sum to each member of a class,* the class closes as of the date of death of testator. This was precisely what happened here. By the will testator erected a $100,000 trust "for the benefit of each and every male child of my sons who shall by birth inherit and bear the name of Earle." This was followed by a gift of the residue, under which testator erected a trust, disposing of both income and principal which is to endure to the utmost limit of permissive remoteness—lives in being and twenty-one years thereafter: *Warren's Estate,* 320 Pa. 112, 113, 182 A. 396. The beneficiaries under the residuary trust were the widow (since deceased) and each of testator's five named children and their issue.

Now the crux of this case is this: if the $100,000 trust now claimed by the afterborn child of George H. Earle III is taken from the residuary trust, such payment diminishes the shares of income and principal not only of George H. Earle III and his four other sons, and their issue, but also of testator's other children and their issue. In other words, *the estate already given and bequeathed is necessarily cut down and diminished.* To accomplish this effectively requires clear and unequivocal language: *Haydon's Estate,* 334 Pa. 403, 6 A. 2d 581; *Harris Estate,* 351 Pa. 368, 41 A. 2d 715; *Fink et al. v. Stein,* 158 Pa. Superior Ct. 464, 45 A. 2d 249. It must be conceded that testator used no *express language* directing that afterborn grandsons of the name of Earle should have their $100,000 trust funds paid out of the residuary trust. It is only by *necessary implication* that such an intent may be declared. The majority in their opinion seek to demonstrate such implied intent. To attempt to analyze and answer the many points submitted in substantiation of the claim of proof of implied intent, would result in entering a labyrinth of generalities and legal principles, most of which I freely concede, but which clear-

ly have no application to this case. The inferences of
testamentary intent which are so voluminously sub-
mitted become less convincing the more they are ad-
vanced. And strange as it may seem, apparently in an
effort still further to strengthen their contentions, the
majority not only conjecture what *testator* intended
but venture to suggest what *counsel* regarded as tes-
tator's intent. In the opinion it is said: "In passing we
note that counsel for the accountant at that audit was
Mr., later, Justice BARNES, who had been testator's
personal counsel and witnessed his will. His acquies-
cence is somewhat indicative of the fact that afterborn
children were intended to be included, otherwise he
would no doubt have had a guardian or trustee ad
litem appointed for that audit and the question *then*
settled."

In construing wills it is my opinion that there
should be no straying from the solid and well defined
highway of testamentary construction. We should re-
frain from entering the misty swamp of testamentary
conjecture, following an illusory will-o'-the-wisp seek-
ing to determine what we *surmise* was testator's true
intent. It is axiomatic that in expounding a will it is
not what the testator may have meant, but what is
the meaning of his words. This principle is analogous
to a provision of the Statutory Construction Act: "The
object of all interpretation and construction of laws
is to ascertain and effectuate the intention of the Leg-
islature; . . . the letter of [the statute] is not to be
disregarded under the pretext of pursuing its spirit."

Judge HUNTER'S adjudication and Judge KLEIN'S
opinion in the court below comprehensively and ac-
curately state the applicable authorities and reach the
correct construction of this will. It would be unnec-
essarily repetitious for me to restate what they have
so well said, and with which I thoroughly agree.

It is for these reasons I note my dissent.