Babcock Estate.

Argued March 23, 1954. Before STERN, C. J., STEARNE, JONES, BELL, MUSMANNO and ARNOLD, JJ.

.

458

*William H. Eckert* and *Fredric L. Clark,* with them *Carl Cherin* and *Smith, Buchanan, Ingersoll, Rodewald & Eckert, Grover C. Ladner, Harvey A. Miller, Miller & Miller* and *Clark, Ladner, Fortenbaugh & Young,* for appellants.

*Paul Kern Hirsch,* with him *H. Fred Mercer, C. John Tillman, Harry E. McWhinney* and *Robert W. McWhinney,* for appellees.

OPINION BY MR. JUSTICE JONES, June 28, 1954:

This controversy is concerned with the effect of a widow's election against her husband's will upon the quantum of the shares in his residuary estate bequeathed to beneficiaries other than herself. The law in such regard is too well settled to require extended discussion. It is rather the manner in which the learned Court below applied the law, in assumed effectuation of what it apprehended to be the testator's overriding intent, which these appeals bring here for review.

By Article One of his will, Edward V. Babcock, the decedent, devised and bequeathed to his wife, Mary, absolutely, his residence property and all his household furnishings and tangibles. By Article Two, he devised and bequeathed all of the residue and remainder of his property to his trustees to divide the same into twenty-four equal parts which he then disposed of in consecutively numbered sections of Article Two. By Section 1, he gave eight of such parts to his trustees in trust to secure an annual income, of guaranteed amount, to his wife for life with directions to his trustees to divide the corpus, after his wife's death, into two equal shares, one of which was to be added to a trust fund under Section 2 for his son, Fred C. Bab-

cock, and the other share to be added to a similar trust fund under Section 3 for his son, Edward Vose Babcock, Jr. By Section 2, the testator allocated three parts to his son, Fred (one-half outright and one-half to his trust), and by Section 3, he allocated two parts to his son, Edward V., Jr., (one-half outright and one-half to his trust). By Section 4, he gave to his nephew, Robert P. Babcock, three parts, absolutely. By succeeding sections, he divided the remaining eight of the twenty-four parts of the residue among beneficiaries, not of his blood, as follows,—one part each to five named employees, two parts to charities to be selected by his trustees and the remaining part to such of his household servants, company employees and personal friends as the trustees, in their uncontrolled discretion, might select.

As already indicated, Mrs. Babcock exercised her right under Section 8 of the Wills Act of 1947, P. L. 89 (20 PS § 180.8), by electing to take against her husband's will and thereby became entitled to one-third of the net value of her husband's *entire* estate, absolutely.

The testator, in obvious recognition of his widow's paramount legal right in the premises and of the possibility of her exercising it, provided in Article Two, Section 1 (where he set up the trust of 8/24ths of his residuary estate for his wife for life with remainder to their sons), that,—"If my said wife shall elect to take against this will, all of the provisions thereof for her benefit shall be thereby cancelled and annulled, and the provisions of this will with respect to all property except that thus taken by my wife shall be carried out in the same manner as if she had died immediately after my death." He also provided in the same Article and Section that,—"If my wife, Mary A. Babcock, shall die during my lifetime, the property

hereinbefore devised and bequeathed in trust for her under this Section 1 of this Article Two of my will shall be disposed of as provided in said Section as though my said wife had died immediately after my death."

In an account filed, the executors took credit for a distribution of income made by them to beneficiaries under the will on the basis of a division of the residue (after deduction of the widow's 1/3rd) into twenty-four parts. Some of the employee-beneficiaries filed exceptions to the account, contending that the effect given by the executors to the widow's election improperly reduced their respective shares from 1/24th to 1/36th each. The exceptants argued that "when the widow filed her election she walked out of the will taking with her the property representing the remainders which her sons would have received had she not elected to take against the will." They contended that their fractional interests of 1/24th each in the entire residue of the estate are not to be diminished by reason of the widow's election. The auditing judge stated the problem, as he saw it, as follows,—"The question thus presented by these facts is whether the widow, by electing to take against the will, extinguished the remainders provided for her two sons in Section 1 of Article Two or whether by her election the remainders of the sons in the trust are accelerated with the right in the sons to be made whole out of the 2/3rds of the estate which remains after the widow takes 1/3rd outright by reason of her election."

The learned auditing judge, having adopted the contention of the exceptants to the account, held that "The remainders of the decedent's sons in the 8/24ths of the estate bequeathed in trust under Section 1 of Article Two were extinguished by the widow's election to take against the will." A decree of distribution was

accordingly entered which entirely eliminated the 8/24ths interest in trust under Article Two, Section 1, from any participation in the distribution of the testator's residuary estate. The effect of the auditing judge's action was to reduce to sixteen the number of equal parts into which he divided the remaining 2/3rds of the residuary estate after the widow's 1/3rd had been deducted. Thus, by the decree of distribution, the court awarded to the exceptants, at the manifest expense of the testator's sons and their families, the equivalent, in amount, of a 1/24th, each, of the net value of the *whole* of the decedent's estate before deduction of the widow's 1/3rd. The trustees under the will and the testator's sons separately excepted to the decree of distribution. After argument, the court en banc (one judge dissenting) dismissed the exceptions in a final decree from which the trustees and the testator's sons have brought these appeals.

There is nothing in the testator's will to warrant the slightest inference that he intended to cancel or annul his sons' remainder interests in the trust fund for his widow for life upon her electing to take against his will. On the contrary, his plain and unambiguous language explicitly confirms what the law independently declares as the effect of the widow's election. We agree with the pertinent observation of the dissenting judge below that, "It is not necessary in construing the will of Edward V. Babcock, deceased, to speculate as to the testamentary disposition he intended to make of his estate if his wife should elect to take against his will." When the words which the testator employed are given their usual and ordinary meaning, they clearly and unmistakably express his testamentary intent.

The law as to the effect of a widow's election to take against her husband's will is not open to dispute.

In *Disston's Estate,* 257 Pa. 537, 541, 101 A. 804, it was said for this court that "The relevant rules of law are well settled with us. In Ferguson's Est., 138 Pa. 208, 219, speaking by Mr. Justice MITCHELL, we state the cardinal principle thus: 'Devises or bequests, subordinate to a life estate in the widow and contingent upon her death, or payment of which is postponed until then, become presently payable upon her election to take under the intestate laws; as to its effect upon all claims under the will, her election is equivalent to her death; this is the general rule, and if there are any exceptions, they must depend on the expression or unavoidable implication of a contrary intent of the testator.'" See also *Estate of Vance,* 141 Pa. 201, 213, 21 A. 643.

To the foregoing must be added that the share which a widow takes of her husband's estate under the intestate law by virtue of an election automatically reduces *pro tanto* the residue available for disposition according to the will. In *Schmick Estate,* 349 Pa. 65, 71, 36 A. 2d 305, where the testator left but one child and his widow elected to take against his will, Mr. Justice STEARNE succinctly summarized as follows: "When his widow elected to take against the will, and received her one-half share under the intestate law, the value of this estate was reduced in exactly that proportion. There was an acceleration of the remainders. The balance in the estate must be held and distributed as directed by the will."

What the law alone would have ordained in the circumstances of the instant case, the testator intended his will to effectuate. Fully cognizant, as he was bound to be (*Estate of Vance,* supra, at p. 209), of his wife's paramount right to take a third of his estate outright regardless of his will, the testator provided in Article Two, Section 1, in connection with the trust

for his wife for life, "If my said wife shall elect to take against this will, all of the provisions thereof for her benefit shall be thereby cancelled and annulled . . . ." Among the provisions *for her benefit* were the devise and bequest of the testator's residence property and furnishings by Article One and the right to a guaranteed minimum income of $20,000 for her life from the trust estate created in Section 1 of Article Two. Nowhere did the testator evidence any intent that his sons' remainders in the trust estate, created by Section 1 of Article Two, were to be cancelled and annulled if his wife elected to take against his will. Had the testator intended otherwise, he would have plainly said so just as he did provide for the cancellation and annullment of the testamentary provisions for his wife's benefit.

Having thus directed, in the event of his wife's electing to take against his will, for the cancellation and annullment of no more than the testamentary provisions *for her benefit,* the testator immediately went on to direct that "the provisions of this will with respect to all property except that thus taken by my wife shall be carried out in the same manner as if she had died immediately after my death." What the widow had thus "taken" by her election was 1/3rd of the testator's entire estate. Consequently, "all property" except the widow's third was the 2/3rds residue of the entire estate as to which the provisions of the will were to be carried out "in the same manner", i.e., by a division into twenty-four equal parts, as if Mrs. Babcock had died immediately after her husband's death. That necessarily means that the vesting, in possession and enjoyment, of the remainders in the trust estate under Section 1 of Article Two was to be accelerated to the date of the widow's election which was the "equivalent of her death."

The provision which we have just been considering is a part of Section 1 of Article Two which, as we have seen, is concerned solely with the trust fund for the benefit of the testator's wife for life with remainder to their sons. In this same Article and Section of the will, the testator further provided that, if his wife should predecease him, the property "devised and bequeathed in trust for her under this Section 1 of Article Two . . . shall be disposed of as provided in said Section as though my said wife had died immediately after my death." The testator could hardly have more plainly indicated his intention that his sons' remainder interests in the trust under Section 1 of Article Two were to be unaffected either by his wife's death or by her election to take against his will save that in the latter event the remainders would be accelerated and diminished by one-third of their amount otherwise.

The widow's election did not, as the auditing judge mistakenly conceived, operate to reduce the twenty-fourth interests in the residue, under the testator's will, to thirty-sixths. The beneficial interests have at all times been in twenty-fourths. The only difference occasioned by the widow's election was that the fund in which the proportionate interests in the residue would share was one-third less than the testator's entire net estate. In other words, the proportionate interests in the residue remained the same after the widow's election, but the fund for distribution among such interests was less. That is no more than frequently happens when a widow elects to take her share in her husband's estate under the intestate law instead of taking under his will and furnishes no justification for arbitrarily disregarding the testator's provisions in the event his wife should elect to take against his will. Such provisions are valid and are to

be enforced as written: *Houston Estate,* 371 Pa. 396, 398-399, 89 A. 2d 525.

The contentions of the appellees are fallacious and serve to demonstrate the error in the auditing judge's reasoning which they endeavor to support. For one example from many, the appellees assert that "when the wife elected to take her 1/3rd part of the estate outright, she took the trust res, and the trust and the remainders dependent thereon were extinguished." That is what the auditing judge similarly concluded. But, the widow took no specific property nor the shares of any specific testamentary beneficiaries. She took one-third of the testator's entire estate. There is no rational basis for deducing that, by her election, she affected the fractional interest of any particular beneficiary under the will other than as she affected all of such interests by reducing the fund for distribution among them.

The decree is reversed at the appellees' costs and the record remanded for the entry of a decree in accordance with this opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Edward V. Babcock lived a life of successful and honorable endeavor. He was mayor of Pittsburgh, County Commissioner of Allegheny County, a business man of numerous enterprises, and accumulated a fortune estimated at the time of his death to be $6,000,000.

As Babcock approached the eventide of his life, he did what every thoughtful and conscientious man does: he took inventory of not only what he had but of what he owed. He possessed $6,000,000, but he owed a debt of gratitude to those who had made it possible for him to attain riches, fame and honors. He owed a

debt first to his family for their love and affection; he owed a debt of gratitude to those who had worked with him in his many undertakings; and as a Christian he felt that he owed something to charity, without which life is meaningless, empty and drab.

In order to dispose of his riches in a manner consonant with the principles that animated his entire life, he called in an expert will-writer to whom he gave certain instructions. While we do not have any record of the specific directions he imparted to the scrivener who was to write the will, the writing itself is before us and from it we can see the blueprint of the testator's mind from which the testament was prepared.

After the usual preliminaries which had to do with the disposition of the testator's house, furniture, carpets, draperies, etc., he directed the scrivener to divide his estate into 24 equal parts. He had given considerable thought to the making of the will, to the division of his big estate, to the rewarding of the faithful and to the assistance of the needy. By dividing his estate into 24 equal parts he could make a distribution which would satisfy every demand of conscience, generosity and gratitude.

His first thought, of course, was of his wife and children. He had already established, even before making his will, various trusts with assets surpassing $1,000,000 in behalf of his wife, his two sons and a granddaughter. He had already created a funded life insurance trust in the amount of $321,000 for his son Fred C. Babcock. This is mentioned to show that the relationship between Babcock and his immediate kin was of the best and to reveal further that the two sons were already well-laden beneficiaries of the generous bounty of their father.

To his wife, then, Mr. Babcock devised and bequeathed a life estate in 8/24ths or 1/3rd of his es-

tate. In order that she should enjoy to the fullest this bequest, the testator provided that the trustees appointed under the will were to hold, manage, invest and reinvest the indicated 8/24ths as a separate trust fund, collecting the income and paying it to her in certain installments. She was to receive at least $20,000 a year. If the annual income for any reason should not amount to $20,000, the trustees were empowered to pay to her "out of the principal of the trust fund, an amount equal to the difference between the net income so distributed and the sum of twenty thousand dollars ($20,000)."

Instead of giving his wife a life estate in the 8/24ths, Babcock could of course have devised and bequeathed her those 8/24ths outrightly because she would have been entitled to 8/24ths anyway under the intestacy laws. He made his bequest a life estate not because he loved his wife less but because, being an astute and capable business man he concluded that in the long run she stood to gain more this way. This procedure would save her share of the estate from double Federal estate taxation (once upon his death and again upon her death.) That there was no thought on his part of limiting her enjoyment of the 8/24ths bequeathed to her is conclusively proved by the fact that the trustees had the right upon request *from her* to invade the principal of the trust, even to the extent of depleting it completely in order to assure her the indicated $20,000 a year.

This 8/24ths of his estate, therefore, was definitely, conclusively and irrevocably taken from the estate as much as if it had been severed by physical means. If Mrs. Babcock took under the will she would enjoy the life estate untrammeledly (with the right to draw against the remainder), and if she took against the

will she would still get the life estate, and what was left, too.

Mr. Babcock made three packages of his estate: one-third for his wife; one-third for his sons and nephew; and one-third for his co-workers and charitable organizations. Each third stood by itself, each was independent of the others. And, within the one-third divisions, each 24th was independent of all others. Nowhere in the will is there the slightest intimation that the enjoyment of any one twenty-fourth was to interfere with any other twenty-fourth. So far as the 24ths were concerned, each could have been a farm, a plantation, a factory, or an island surrounded with a steel fence.

Under the scheme of distribution then, we find that the wife was to receive a life estate in 8/24ths. In the second division allotted to his own flesh and blood he gave 3/24ths to his son Fred, 2/24ths to his son Edward, and 3/24ths to his nephew Robert. It is not hinted anywhere in the will that the sons or the nephew could encroach upon the portions assigned to others in the will, as indeed those others could not encroach upon the 24ths allotted to Fred, Edward, and Robert.

In the third classification stood Babcock's co-workers, his employes and favored charities, each 24th in its own separate water-tight compartment of mathematical subdivision.

After this arithmetical and scientific division of his estate, Mr. Babcock approached consideration of the possibilities which go with every event suspended in the mists of the undiscovered future. The indicated legatees might die before the testator, the employes might leave the employment of their master at the time the will became effective, any number of things could happen. As against the possibilities that any

particular legatee would not be available to receive outrightly his legacy, the testator provided for substitutions in the form of living spouses, children, other legatees and so on. While any particular legatee might (because of the possibilities already anticipated with regard to other legatees) obtain a larger share than the 24th or 24ths outrightly bequeathed to him, in no possible connection could any legatee obtain less than the 24th directly bequeathed to him. For instance, if the legatee H. B. Leech (under Section 7) should predecease the testator, Leech's share would pass to and be divided among other residuary legatees in proportion to their respective interest. Thus, it is to be seen that some of the other legatees could get something more than 1/24th, but Leech himself (if alive and in the employ of the Babcock interests), could never receive less than the 1/24th irrevocably apportioned to him.

The testator, of course, had no way of knowing whether his wife would take under the will or against the will, but he provided for either possibility. In the event she took under the will, the remainder, after exhaustion of the life estate, less also whatever she might have drawn from the principal in order to be assured of $20,000 per year, would go to Fred and Edward Babcock. In the event she took against the will, the testator provided:

(1). "If my said wife shall elect to take against this will, all the provisions thereof for her benefit shall be thereby cancelled and annulled,

(2). and the provisions of this will with respect to all property except that thus taken by my wife shall be carried out in the same manner as if she had died immediately after my death".

Analyzing this paragraph we find that the first part, which I have marked No. 1, cancels and annuls

everything concerning the wife's share of 8/24ths. It cancels not only the life estate but the provisions with regard to Fred and Edward receiving the remainder after the life estate has been exhausted. All provisions for the wife's benefit are "cancelled and annulled." The supposed rights of Fred and Edward in the wife's 8/24ths provisions are only a tail to the kite that cannot exist without the kite. Once the kite disappears the appendage disappears with it.

In the No. 2 section of this paragraph, the testator says that the provisions of the will with respect to "all property" (except that taken by the wife), that is, the balance of 16/24ths, shall be carried out in the same manner as if the wife had died immediately after the testator's death. That is to say, the provisions regarding the 16/24ths are not to be disturbed in any way.

Once Mr. Babcock contemplated the possibility of his wife taking against the will, he naturally envisaged all the contingencies that would go with that selection. Would the remainders to Fred and Edward be wiped out, or would Fred and Edward be entitled to demand that the remainder from the 8/24ths now be taken from the other 16/24ths? There cannot be the slightest question that he intended the remainder to be wiped out. If he had desired that the remainder from the life estate was to survive even though the wife took the 8/24ths outrightly, it would have been the simplest matter for him by the addition of a single sentence in the last paragraph of Section 1 of Article Two of the will to so declare. A matter of this grave importance would not have been left to mere assumption, or, worse yet, conjecture. As the learned President Judge Boyle stated in his opinion in the court below: "Had the testator intended that the remainders provided for his sons under Section 1 of Article Two of the will were

to be accelerated and made whole out of the two thirds of the estate remaining after the widow's election to take against the will, he would have so stated in plain and unmistakable language. He knew of the possibility and effect of the widow's election and wished to protect the beneficiaries outside the family against it. It is reasonably certain that one who planned the distribution of estate as carefully as did the testator in the case at bar would not have allowed so drastic a change in his testamentary scheme and the distribution of so large portion of his estate to rest upon the operation of a rule of law when a sentence in the will would have accomplished the result for which the exceptants contend."

If we compare an estate to a ship with hull and superstructure, we might call the superstructure the life estate and the hull the remainder. Once the wife decides to take the *whole* ship and sails away, the trust and its remainders sail away, too. When the wife takes the trust res, it inevitably follows that all its remainders are extinguished.

The Majority says that "there is nothing in the testator's will to warrant the slightest inference that he intended to cancel or annul his sons' remainder interests in the trust fund for his widow for life upon her electing to take against his will." But there is nothing in the testator's will to warrant the slightest inference that the sons, who were to have what Mrs. Babcock left of the trust estate created for her, could demand, if she left nothing, contribution from other legatees. The sons could not demand from other trees the fruit they had expected from Mrs. Babcock's orchard. And they had their own orchards, all provided for by the one common benefactor, Edward V. Babcock.

When the wife took her portion of the estate outrightly, the trust fund for her benefit was automatically cancelled. The second paragraph of Section 1 reads: "Upon the death of my said wife, the said trustees shall divide the trust fund then held in trust for her into two (2) equal shares." But with the cancellation of the trust, through the absolute taking of the res, it is supererogatory to speak of a trust *then held in trust for her*. It no longer exists.

Furthermore, (and this to me seems conclusive of the evanescent character of the remainder which Fred and Edward pursue so tenaciously,) we will recall that the trustees were empowered to draw whatever might be needed from the res of the 8/24ths in order to guarantee to Mrs. Babcock $20,000 a year. It is entirely within the realm of possibility that in order to maintain this yearly income the whole principal could have been consumed. If the rights of Fred and Edward to this remainder were so positive that, according to the Majority, the other bequests in the will could be invaded to make up the so-called remainder, why is it that the testator, who provided for everything else, made no provision to supply Fred and Edward with whatever would be taken from the corpus of Mrs. Babcock's share in order to assure her the $20,000 per annum?

The Majority makes that part of Section 1 of Article Two providing for the sons' remainders, the controlling feature of the will. The Majority writes as if that were the burning torch of the will around which everything else revolves like moths flying about an open flame. But Sec. 1 of Article Two is only a *part* of the will. It is of no more importance than any other. To assign to that section of the will the superiority read into it by the Majority is to assume that the other items are mere unmeaning appendages. It is to

assume that the testator exhausted all his wisdom, skill and generosity in the initial stages of the will and then haphazardly, ignorantly, unfeelingly and carelessly disposed of the rest. This interpretation defies reason, opposes logic, and is contrary to the simplest reading of the document. Over and over this Court has said that we must take the meaning of the testator from the four corners of the will. The Majority wants to take the meaning from only one corner.

In *Mulert Estate,* 360 Pa. 356, 359, this Court said: "The intention of testator is the *polar star* in the construction of wills."*

In *Earl Estate,* 369 Pa. 52, 55, this Court said: "It is well settled that the intention of a testator is the *polar star* in the construction of wills."

In *Anderson Estate,* 373 Pa. 294, 296, this Court said: "In the interpretation of a will the intention of the testator is the *pole star* and that intention must be ascertained from a consideration of the entire will and all the surrounding and attendant circumstances."

In the interpretation of the Babcock will, the Majority has not taken Mr. Babcock's intention as a pole star but rather as the feeble light of a flickering lantern. The Majority has completely ignored the mathematics of the case. Words are transitory, elusive, evasive, equivocal and fickle. They may mean one thing in one association and something else in another association, but figures are constant, adamant and unyielding. It was the contention of the sons and the trustees in the court below, and here, that with the election of the widow to take against the will, the legacies to the employes, servants and charities were reduced from 24ths to 36ths. The learned Auditing

---

* Italics throughout, mine.

Judge rejected this change in fractions: "To sustain the contention of the executors and the sons of the decedent that the fractional interests of the exceptants in the residuary estate are to be reduced from a 1/24th each to a 1/36th would be to distort the entire plan of distribution contemplated by the testator."

But the Majority has upheld the appellants and thus awarded to Saxman, Anderson, Leech, Friday and Meadows 1/36th of the residuary estate, to charities 2/36ths and to the servants and other employes 1/36th. The will, however, only speaks of 24ths. It categorically divides the testator's property into 24 parts: "All the residue and remainder of my property, real and personal, including all property which, under any of the foregoing provisions of this will, shall be disposed of under the provisions of this Article Two, I devise and bequeath to the trustees named in Article Four hereof, in trust to divide the same into *twenty-four (24) equal parts.*"

This division of the property into 24 parts is designated in the will in *twelve* different places. The fraction of 1/36th is not mentioned once. Thus, although the intention of the testator is supposed to be a pole star, although he states twelve different times that his property is to be divided into 24ths, this Court, under the light of that pole star, divides the property into 36 parts!

Mr. Babcock, fully cognizant of what he owed his co-workers Saxman, Anderson, Leech, Friday and Meadows, for their long years of faithful service, solemnly obligated himself to discharge that moral obligation by giving each of them 1/24th of his estate. This Court says that Mr. Babcock did not mean that. Although he said 1/24th he really meant 1/36th. Pole Star!

The Majority attempts to show that the fraction on which the multiple parts are being computed is not 1/36th but 1/24th, because each distributee still gets his share based in 24ths on *what is left* after the sons carry away what is taken from the other residuary legatees. But this is a juggling of figures. It is as clear as daylight in mid-June that the testator divided the *whole* estate into 24ths, not what was left after any certain remainders were deducted. It is not much consolation to tell Mr. Babcock's faithful employes that although their appreciative and generous employer left them each a 24th of his estate, they should be content with 1/24th of what remained after the workings of a technicalism which is nowhere mentioned, nowhere recommended, or nowhere inferred by Mr. Babcock.

The division into 24ths was made at the very beginning of the will, not after the disposition of the remainder to the sons. Since the testator knew that the wife could take against the will and since he would have to know (according to the Majority), that in that event the sons would take an additional one-third from the 16/24ths which would be left, the testator, according to the Majority, would then have had to speak of a division into 24ths at the threshhold of Section 5 of Article Two, that is to say, 11 pages after the beginning of the will itself. But it is to be noted that this argument about a second division into 24ths evaporates when one recalls that Article Two (on the first page of the will) begins: "All the residue and remainder of my property, real and personal, . . . I devise and bequeath to the trustees named in Article Four hereof, in trust to divide the same into twenty-four (24) equal parts . . .". Eleven pages later, when the testator comes to bequeathing portions of his estate to his employees, he says: "Sec. 5. One (1) of *such* twenty-four (24) equal parts I devise and bequeath

476

absolutely to John K. Saxman . . ." The *such* twenty-fourth part obviously refers to the division specified on *page 1 of the will,* not to a hypothetical division possible after deduction of remainders.

The Majority cites the rule that "the share which a widow takes of her husband's estate under the intestate law by virtue of an election automatically reduces *pro tanto* the residue available for disposition according to the will." That rule does not change what is involved here because, after the widow took outrightly her 8/24ths, there were still left 16/24ths. Whether the widow took with or against the will there were always 16/24ths of the estate left. There were always the 16 steel-fenced islands irrevocably devised and bequeathed to specific beneficiaries. The quoted rule does not say that that which a remainderman could have taken upon the expiration of a life estate from a *certain portion* of the estate, shall reduce specific bequests out of another, *different portion* of the estate. The Majority here speaks of the sons when it apparently means the widow, and, possibly, the widow when it means the sons. Such a consanguineous confusion can only lead to a confused testamentary distribution and bring about not only an inequitable apportionment, but one wholly at variance with the intention of the testator.

Mr. Babcock was a very successful business man, obviously a very conscientious man, and a man who knew that whether it be a will to be written or a lumber mill to be constructed, every detail must be thought out thoroughly and put on a paper if the will or the mill is to stand the crucial tests to which man will put it. Thus his will was not a short one; it takes up 28 printed pages in the record. It is utterly impossible for me to conclude that with such a long, well-prepared, detailed, meticulous treatment of the entire subject of disposition of his property, he would omit

the transposition of 24ths to 36ths if he intended that such transposition was to come about. Especially in view of the fact that, as already indicated, he specifically addressed himself to the subject of his wife's taking against the will, creating the situation which the sons have seized upon to augment their share of the estate.

If Mr. Babcock wanted Fred and Edward to take from the other legatees a portion of the 24ths specifically bequeathed to them, he would have said so.

In Section 1 of Article Two of the will we find the following: "If my wife, Mary A. Babcock, shall die during my lifetime, the property hereinbefore devised and bequeathed in trust for her under this Section 1 of this Article Two of my will shall be disposed of as provided in the said Section as though my said wife had died immediately after my death."

This paragraph only emphasizes the intention of the testator that those entitled to certain 24ths of the estate will receive it regardless of the fate of the wife's 8/24ths. In the event the wife predeceased the testator, it would naturally follow that the wife could not have then chosen to take 1/3rd of the estate outrightly. Upon the testator's death, therefore, in accordance with the above section, this wife's share of 8/24ths would be divided equally between the sons Fred and Edward, entirely unrelated to the other 16/24ths, so that each 24th would remain intact and thus Saxman, Anderson, Friday, Leech and Meadows would each receive 1/24th of the estate.

Mrs. Babcock, however, did survive the testator, and did elect to take against his will and for that contingency, as already indicated, the testator made provision for cancellation of a certain part of the will. It is to be observed that with respect to the circum-

stances of the election of the wife to take against the will, the testator wrote an entirely different paragraph from that written in the circumstance of the wife's death before his own. The Majority assumes these paragraphs mean the same thing and so indicates: "The testator could hardly have more plainly indicated his intention that his sons' remainder interests in the trust under Section 1 of Article Two were to be unaffected either by his wife's death or by her election to take against his will save that in the latter event the remainders would be accelerated." A comparison of the two paragraphs will show that this does not follow. In the predeceasing clause nothing is said about cancellation of benefits but in the anti-will-election clause the testator specifies that all provisions for the wife's benefits are to be *cancelled and annulled.*

Under the reasoning employed by the Majority in this case, it would seem that the testator provided a device whereby his widow, through taking 1/3rd of the estate outrightly could then get her sons to demand, in addition to their own shares, additional portions to be carved from the shares allotted to others. This suggests a deviousness which is not only not in keeping with the character of the testator, but suggests also a stupidity that is repulsed by the entire testament, for why would Mr. Babcock seek to accomplish so heavy-handed a maneuver in order to take from his close friends, his associates and charities dear to his heart what he had with solemn sincerity already marked for them, when he could have turned over to his sons that additional bag of wealth directly?

"A construction will be avoided which would lead to *an unnatural, improbable or absurd result,* and which, under all the language in the will, would constitute a highly improbable testamentary intent . . ." (Walker Estate, 376 Pa. 16, 22.)

The cases cited by the Majority are, in my opinion, an insecure foundation upon which to build the wall of argument which keeps the legatees under Sections 5 to 11 out of their rightful heritage. It is true, as stated in *Ferguson Estate,* 138 Pa. 208, that ". . . devises or bequests, subordinate to a life-estate in the widow and contingent upon her death, or payment of which is postponed until then, become presently payable upon her election to take under the intestate laws. As to its effect upon all claims under the will, her election is equivalent to her death . . .". But it will be noted that the statement goes further: "and if there are any exceptions, they must depend on the expression or unavoidable implication of a contrary intent of the testator."

The expression of the testator Babcock excepting to the rule indicated could not be clearer to the eye if he had forged it in bronze, instead of writing it on paper.

In *Disston's Estate,* 257 Pa. 537, this Court, speaking through Justice MOSCHZISKER (later Chief Justice), said: ". . . an intent that there shall be no acceleration may be shown by inevitable implication, as, for instance, where the will itself fixes a definite time for distribution independently of the widow's death, or *expressly provides as to the effect* of her refusal to take thereunder . . ."

As we have already pointed out, the testator here has "expressly provided as to the effect" of her (Mrs. Babcock's) refusal "to take thereunder." Chief Justice MOSCHZISKER said also in the *Disston* case: "In a case like the one before us, the effort must be to find and carry out *the testator's chief intent with a minimum disturbance of the general plan of the will.*" We *know* what the testator's intent was in the case at bar.

The case of *Schmick Estate,* 349 Pa. 65, also cited by the Majority, not only does not support the Majority's position but on the contrary lends weight to the decision of the court below. After stating the general rule about the acceleration of remainders, Mr. Justice AL-LEN STEARNE, speaking for the Court, said: "There is, however, a well defined exception to this general rule of acceleration. Where acceleration works a hardship, parts of the estate may be *sequestrated,* in accordance with equitable principles, for the benefit of disappointed legatees and devisees."

If the Court has the power to halt an acceleration because of hardships it would inflict, with what greater reason could it stop an acceleration if the acceleration defeats the testator's intention? In ascertaining the intention of the testator in that case, Justice STEARNE said: "To gather the testamentary intention we must place ourselves in 'testator's arm chair' and consider the circumstances surrounding him when he executed his will: Postlethwaite's Appeal, 68 Pa. 477; McGlathery's Estate, 311 Pa. 351, 166 A. 886. The will reveals testator's complete satisfaction with his own philosophy of life and his success. He perpetuated his memory by provision for maintenance of his mausoleum and the erection of a charitable foundation, named for him, to benefit the 'poor sick' and 'poverty stricken' of his native borough." Justice STEARNE then, point by point, analyzed the will showing just what the intention of the testator was. Is there any difficulty in ascertaining the intention of the testator Babcock? He wanted to divide his estate in such a way as to provide for those who had been close to him in home, office, field, and mill. During his lifetime he had made other handsome provisions for his wife and children. He made it clear that nothing was to disrupt the division of his estate into 24 parts so that the objects of

his bounty in home, office, field, and mill would all receive the shares that his mind, heart and conscience dictated so clearly.

The Majority of this Court has ignored that primary intention of the testator. It has in effect rewritten the will of Edward V. Babcock. It has substituted its judgment for that of the testator, it has disposed of his wealth in defiance of his expressed declaration, it has attributed to him a slyness which the record does not warrant; it has made him an Indian giver; it has put him in the light of a duplicitous master who said one thing to his employes and servants and then did something else. And all this has been done in the name of the law. It has done all this in tribute to a supposed technical rule which strikes tyrannically and arbitrarily, unconcerned for facts, heedless of circumstance, blind to reality and deaf to the demands of justice. It has taken from the servant and taken from those whose loyal services contributed to the formation of the fortune here being litigated; it has taken from those who need and given to those who do not need; it has taken from the meager purse of charity and added to the swollen chests of treasure. It has done all this in the name of law, but the law which the Majority invokes is not a law which for the good of the common weal must occasionally impose an individual hardship. The law which the Majority calls upon is not insensate, it is not irrational, it is not obdurate. When properly invoked it does accomplish justice, it does make for certainty and fairness, all so necessary in society if order is to be served and continuity to be preserved. The trouble here is that the rule of law which the Majority has invoked has no application to a set of facts such as here presented. It assumes that there must be an acceleration of the remainder estate regardless of time, tide and circum-

stance. In 1928 this Court did not see acceleration in so arbitrary a light. Chief Justice VON MOSCHZISKER, speaking for the Court in *Feeney's Estate,* 293 Pa. 273, 285, said: "This doctrine of acceleration, however, is *not an arbitrary one,* but it is founded, in the case of a will, on the presumed intention of the testator that the remainderman should take on the termination of the previous estate notwithstanding the prior donee may be still alive, and is applied in promotion of the presumed intention of the testator and *not in defeat of his intention . . ."*

In *Lonergan's Estate,* 303 Pa. 142, 148, Mr. Justice SIMPSON said: "What a testator's intention is must be gathered from the language of his will only, and not from a possible, but unexpressed, intent (French's Est., 292 Pa. 37; Ludwick's Est., 269 Pa. 365); hence his estate *should be distributed, notwithstanding the election of the widow to take against the will, as nearly as possible in accordance with what he says,* and so we declared in Disston's Est., 257 Pa. 537, 543, when we said, in dealing with the question now under consideration, that 'the effort must be to find and carry out the testator's chief intent with a minimum disturbance of the general plan of the will.' "

The rule expressed by the Majority that in cases of this character the widow's election is equivalent to her death is not a hard, fast and unyielding rule. Mr. Justice SIMPSON made this very clear in the same *Lonergan's* case: (p. 147) ". . . Courts of equity are not bound by such phrases as that 'the election of the widow is equivalent to her death,' as the opinion writer in the cases being reviewed held that he was, but decide in each case *as equity and good conscience require, so that exact justice, as nearly as this is possible in human affairs, may be done to all parties in in-*

*terest.* This, indeed, is said to be the justification for the existence of such courts. The orphans' court, within the sphere of its jurisdiction, is a court of equity."

Carrying out the principle announced in the above, it is my considered judgment that "equity and good conscience" require that the decree of the lower court be affirmed. Since the Majority of this Court is of a contrary view,

I dissent.