## Wilstach Estate

*James A. Montgomery, Jr.*, for accountant.

*R. Sturgis Ingersoll*, for Philadelphia Museum.

*Irving M. Kieff*, Deputy Attorney General, for Commonwealth.

KLEIN, P. J., October 9, 1954.—Anna H. Wilstach died on February 26, 1892, leaving a will and seven codicils which were duly admitted to probate. The will was executed July 31, 1873, and provides, inter alia:

"Item.—One other equal fourth part thereof (i.e. of the residue of her estate) unto the City of Philadelphia if accepted by the Fairmount Park Commissioners as now authorized by Act of Assembly, upon the conditions and for the purposes following, namely:

"To erect a secure Art Gallery in said Park for the exhibition of pictures and works in Fine Arts, on a plan similar to the new building for such exhibition at Dresden in Saxony, to be so built as to admit of extension with the increase of funds without impairing the harmony of the edifice or destruction of any portion of the original building, but if there should be a suitable permanent building left in said Park after the Centennial celebration of 1876, in which pictures mentioned below may be received and preserved distinctly from other collections so as to be known as the 'Wilstach Collection' then the erection of another building may be omitted, and donations shall be accepted for said collection, and invited by the said Commissioners. To the said City, but to be under the custody and control of the said Fairmount Park Commissioners I also direct all my paintings, pictures and statuary including those of my late husband to be given and transferred to the said City for said purposes and placed in the 'Wilstach Collection'. Their exhibition shall be public, under regulations to be established by the said Fairmount Park Commissioners, and as soon as practicable shall be gratuitous, and the opening thereof shall be as soon after my decease as a gallery can be provided for their reception.

"All the said fourth of said residuary estates not expended in erecting such Hall of Art, and the whole

if no such Hall shall be required to be built out of said fund shall be kept invested in lawful investments by the said Fairmount Park Commissioners subject to the jurisdiction of the courts having control of testamentary trusts, and the income thereof shall be by them applied to the purchase of pictures, paintings and statuary for said collection, always keeping in view the purpose of obtaining objects of the highest skill and beauty, that they may be the source of pleasure and the means of cultivation and refinement of the taste of the people, be pure in sentiment and never minister to vulgarity and vice.

"*Provided* however that if the principal should exceed the sum of One hundred thousand dollars, then the *excess* over that sum, may be used for the purchase of works of art. . . ."

In 1876, three years after the original will was executed, the Centennial Exposition was held in Philadelphia. Most of the buildings of the exposition were erected in Fairmount Park and were of a temporary nature. One of these buildings, however, Memorial Hall, was built as a permanent structure by the City of Philadelphia, whereupon testatrix made a seventh codicil to the will on March 7, 1890, in which she provided for the housing of the William P. Wilstach art collection therein. The codicil reads, inter alia, as follows:

"I give and bequeath to the City of Philadelphia, all my Paintings, Engravings, Statuary, Photographs, Books on Art, and catalogues of various Galleries in Europe & America. Also my Books denominated 'Dresden Gallery,' containing engravings of the Paintings in the Dresden Galleries, in Dresden, Saxony, and all works of art owned by me at the time of my decease, in trust, nevertheless, to, for and upon the following uses, intents & purposes, To wit: To place the said paintings, Statuary, Photographs and

works of Art in the possession and under the control of the Commissioners of Fairmount Park, to be placed by them in Memorial Hall, in Fairmount Park, there to be preserved by them & taken care of & kept in good order, as the nucleus or foundation of an Art Gallery for the use and enjoyment of the people. The Collection to be kept together, and known and designated by the name of 'the W. P. Wilstach Collection'. And I direct my Executors to transfer to the Commissioners of Fairmount Park, in like manner in Trust, the one other fourth part of the residue and remainder of the said estate and estates, which said sum shall be invested in good and lawful securities by the said Commissioners of Fairmount Park. And the interest accruing therefrom shall be used for the maintenance of said Art Gallery, in keeping the same in good order & condition, and providing of competent care-takers, as may be necessary to carry out, to its full and complete extent and meaning, the design I have in view in making this devise and bequest for the founding and sustaining an Art Gallery in Fairmount Park for the use & enjoyment and benefit of the public. The balance of the income from said investment fund, not required for the proper care and maintenance of the Gallery, shall be used for the increasing of the collection, in such manner as the said Commissioners of Fairmount Park may deem best. The said Commissioners of Fairmount Park to make rules and regulations in regard to the use & enjoyment of said collection as will best conduce to the end intended."

The assets presently accounted for were awarded to the present accountant by adjudication of this court, dated January 4, 1894, and schedule of distribution approved March 14, 1894. As appears from the terms and provisions of the will and codicil quoted above, the trust is a perpetual charitable trust and the occasion of the filing of the present account is stated to be

"to resolve questions as to petitioner's authority to dispose of certain paintings".

The Commonwealth of Pennsylvania is listed in the statement of proposed distribution as the only party in interest and notice of the audit is stated to have been given to Hon. Frank F. Truscott, Attorney General, as conservator of charitable trusts. Pursuant to section 10 of the Estates Act of April 24, 1947 P. L. 100, Mr. Truscott, Attorney General, by Irving N. Kieff, Deputy Attorney General, entered an appearance for the Commonwealth of Pennsylvania.

It appears from the statement of proposed distribution that collateral inheritance tax has been paid upon the entire estate and no claim for tax was made by the Commonwealth at the audit.

Testatrix, at the time of her death, owned 158 paintings. The Commissioners of Fairmount Park, as trustees, have received as gifts, since testatrix's death in 1892, 55 paintings and have purchased from time to time with income from investments 238 additional paintings.

The Philadelphia Museum of Art has acted as custodian of the collection, under the control of the Commissioners of Fairmount Park, the trustees, continuously since Mrs. Wilstach's death. The collection has been housed during this entire period in Memorial Hall. As the result of a decision made recently by the commissioners, Memorial Hall is being converted into a recreational building and is no longer available or suitable for exhibiting paintings and other art objects. The collection is, therefore, being transferred for custody and exhibition to the Philadelphia Museum of Art building. This building, as well as Memorial Hall, is owned by the City of Philadelphia and is located in Fairmount Park and it certainly seems clear that no valid objection can be made to the transfer of the collection. Testatrix's choice of Memorial

Hall, as the building in which the collection was to be housed, was obviously made because it was the only building available at the time.

The commissioners, upon recommendations of the Philadelphia Museum of Art, have in the past sold two of the paintings which formed part of the original collection, 24 of the paintings received as gifts, and 71 of the paintings purchased from income. It is now their intention to sell 132 more of the original paintings, 19 of those received as gifts and 88 of those purchased from income.

The statement of proposed distribution requests the auditing judge to determine three questions:

1. Whether, under the language of the will quoted above, the accountant has implied authority to sell works of art out of the collection forming part of the trust res, where such works of arts are deemed to be making no contribution to the collection as a whole;

2. If the accountant is found to have no such implied authority, whether it may sell certain specified works of art (a list of which was presented at the audit and is annexed hereto), which formed an original part of the collection or were subsequently added thereto by gifts of others, under the provisions of section 963 of the Fiduciaries Act of April 18, 1949, P. L. 512, upon proof that such sale is for the best interest of the trust, and

3. Whether certain prior sales (consisting of two paintings forming part of the original collection and of several paintings added to the collection by gifts of others) can be confirmed nunc pro tunc.

Mr. Montgomery, representing the accountant, contends that the trustees have an implied right to sell any of the paintings which they consider unworthy of exhibition as part of the collection. He frankly admits, however, that he can find little authority in support of his position. This is readily understand-

able as the instant case is apparently one of first impression in this State by reason of the unusual provisions of this will.

Mr. Montgomery relies principally upon the language of testatrix studied in the light of the circumstances of this case and upon the statement of the general law found in A. L. I. Restatement of the Law of Trusts, §380, which concludes that:

"The Trustee of a charitable trust can properly exercise such powers . . . as . . . are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust."

The auditing judge, after a careful study of this entire record, has reached the conclusion that Mr. Montgomery is correct in his position.

In the interpretation of a will, testator's intention is the pole star. This intent must be ascertained by a consideration of the entire instrument, which must be read in the light of the circumstances surrounding testator at the time it was made: Newlin Estate, 367 Pa. 527 (1951) ; Anderson Estate, 373 Pa. 294 (1953). Ordinarily, the attendant circumstances included such matters as the condition of his family, the natural objects of his bounty and the amount and character of his property: Britt Estate, 369 Pa. 450 (1952). In the present case, in which testatrix has established a perpetual charitable trust, we must also explore the cultural climate in which she lived when she executed her will in order to comprehend the object she wished to attain. As our Supreme Court said in McGlathery's Estate, 311 Pa. 351, quoting the familiar language of James, L. J., in Boyes v. Cook, 14 Ch. Div. 56:

" 'You may place yourself, so to speak, in the testator's arm chair and consider the circumstances by which he was surrounded when he made his will, to assist you in arriving at his intention'."

See also Jackson's Estate, 337 Pa. 561 (1940) ; Earl Estate, 369 Pa. 52 (1951).

With this in mind let us examine the circumstances of this case.

Anna H. Wilstach, testatrix, was the widow of William P. Wilstach, a wealthy citizen of Philadelphia who died in 1870, leaving a considerable number of paintings and other objects of art. Both husband and wife were pioneers in this country in the field of art collection, having started their collection at or about the time of the Civil War.

Mr. Wilstach's will was made in 1869, at which time there apparently were very few public art galleries in the United States. His will contained a provision, which, however, never became operable, for the erection of a building in Fairmount Park: "To be used as a Public Picture Gallery on a plan similar to the new Building in which the pictures of the Dresden Gallery are now exhibited in the City of Dresden, Saxony. . . ."

He provided further:

"In the present advanced state of public feeling for the Fine Arts I believe that a permanent Building arranged and adapted for the purpose of a Picture Gallery and a permanent organization to take charge of it, are the first requisites in the steps necessary to create a Public Gallery. This bequest is made with the idea that when the City of Philadelphia has a suitable building and an organization to take proper charge and to advocate an interest for the Fine Arts, that public spirited citizens and artists will contribute liberally to it in both money and works of Arts which will in time result in such a collection of Pictures and other Fine Arts Works that will tend to increase the aesthetic taste of the inhabitants and add to the fame of the City."

Under her husband's will, Mrs. Wilstach, by reason of the death of their only child in her lifetime, was

given the income for life with a general power of appointment in remainder over principal.

It seems clear that testatrix desired to carry out the plan conceived by her husband as she also provided for the founding of an art gallery similar to the Dresden Gallery. She directed further that the income of one fourth of her residuary estate be applied by the Fairmount Park Commissioners "To the purchase of pictures, paintings, and statuary for said collection, always keeping in view the purpose of obtaining objects of the highest skill and beauty, that they may be the source of pleasure and the means of cultivation and refinement of the tastes of the people, be pure in sentiment, and never minister to vulgarity and vice."

Her will is completely silent with respect to the right of the trustees to sell any of the paintings or other works of art bequeathed by testatrix. Nowhere in her voluminous testament can any language be found which suggests that she wished to prohibit the trustees from selling any of the paintings in the collection, if they thought the quality of the collection as a whole would be improved thereby.

Mrs. Wilstach and her husband were obviously both public spirited citizens of culture and refinement. It seems evident that her primary purpose was to give effect to her husband's plan of furnishing the people of Philadelphia with a much needed public art gallery. Although she does provide that the collection "be kept together, and known and designated by the name of 'The W. P. Wilstach Collection'" in honor of her deceased husband, she gave no indication that she regarded all of the paintings and other art objects owned by her as priceless museum pieces to be retained perpetually by her trustees. On the contrary, she strongly indicates that she contemplated changes and additions to the collection because she directed that the collection be preserved and kept in good order "as the nucleus or

foundation of an Art Gallery for the use and enjoyment of the people."

She conferred a wide discretion upon her trustees and authorized them "to make such rules and regulations in regard to the use and enjoyment of said collection as will best conduce to the end intended." A reasonable interpretation of this language suggests that testatrix intended that the trustees have the broadest powers to buy and sell paintings, in their discretion, in order to enhance the artistic and aesthetic value of the collection as a whole.

She certainly could not have intended that the Commissioners of Fairmount Park apply to the court for permission every time they intended to sell a painting or other art object. Such a requirement would make the successful management of the collection most cumbersome and impractical.

The auditing judge, therefore, concludes that the Commissioners of Fairmount Park, as trustees, have the absolute right, in their discretion, without first obtaining permission from the court, to sell any painting, statuary, photograph or other work of art forming part of the estate of Anna H. Wilstach, singly or in a group, either at public or private sale, provided that the collection is "kept together, and known and designated by the name of 'W. P. Wilstach Collection' " and is made available to the public in accordance with the provisions of the will.

As stated hereinbefore 55 paintings have been added to the collection as a result of gifts made by public spirited citizens since testatrix's death in 1892. In the absence of any restrictive provision in the instrument creating the gift, the trustees would appear to have the absolute right to sell or otherwise dispose of these paintings or other art objects, if they believe that such sale or disposition would best serve the interests of the collection as a whole.

In view of the auditing judge's conclusion that the trustees have the right to sell these paintings, in their discretion without court approval, it becomes unnecessary to make any order with respect to the sale of the paintings already consumated or to the contemplated sale of the 239 paintings at the present time. However, the auditing judge wishes to state that he wholeheartedly approves the action of the trustees, and if formal approval were necessary, that he would grant such approval without hesitation.

An art museum, if it is to serve the cultural and educational needs of the community, cannot remain static. It must keep abreast of the advances of the times, like every other institution whose purpose is to educate and enlighten the community.

In the days when testatrix and her husband were accumulating their art collection, there were very few art museums in the United States, whereas there are some 150 college museums and 250 public museums in operation today.

The great American collectors, such as Widener, Johnson, Frick, Mellon, Morgan and Huntingdon had not yet entered the field. The vast literature which flourishes today was in its infancy. Early collectors, like the Wilstachs, had little reliable information available to assist them in assembling their collections. Much of what they purchased was therefore not of such artistic quality as would be worthy of exhibition in a first class art museum today.

In the early days, directors of art museums found themselves in charge of big, but empty buildings. Virtually every painting owned by every museum, regardless of quality, was constantly on exhibition. The custom was to hang as many pictures as possible, as close together as possible, often placing several paintings one above the other. It required a myriad of pictures to cover the available wall space. They there-

fore bought in large quantities and exhibited practically everything they could acquire.

Today the fashion has changed completely. Each picture is hung in a manner to achieve maximum effectiveness. The number of paintings shown in a single room has been drastically reduced. Considering the great number of masterpieces now forming part of the great collections, it is mandatory that all collections be constantly screened and weeded out, so that only the best, not only educationally and historically, but also artistically, are kept for exhibition.

The recommendations of the Philadelphia Museum of Art to dispose of these paintings were not made lightly or casually. They represent almost 15 years of careful study to determine which of the paintings were of sufficient merit to warrant exhibition in a great metropolitan museum.

The members of the museum staff responsible for the final selection are: Fiske Kimball, director of the museum; Henri Marceau, associate director and chief, division of painting and sculpture, and also curator of the John G. Johnson collection; Henry Clifford, curator of paintings, and Henry McIlhenny, curator of decorative arts.

The trustees also sought the advice of John Coolidge, director of the Fogg Museum at Harvard University, who is one of America's leading authorities in the field of art and museum management and who concurred in the recommendations made by the museum staff.

R. Sturgis Ingersoll, distinguished president of the Philadelphia Museum of Art and a widely known art collector and connoisseur, has also made a study of the paintings in question and joins in the recommendations made to the trustees.

Mr. Kieff, on behalf of the Attorney General of Pennsylvania, submitted a letter to the auditing judge, which is made part of the record in this case, in which

he states that the Commonwealth has no objection to the sale of the paintings by the trustees.

At the request of the auditing judge, the trustees submitted to the court a comprehensive report, setting forth in detail the reasons upon which the decision of the museum staff and their advisor, Mr. Coolidge, to sell each painting was based. This report has been made part of the record in this case.

An analysis of the record indicates that the paintings which have been selected for sale may be divided into eight categories:

1. Paintings by contemporaries of testatrix who were artists of minor importance during her lifetime and who have never achieved any substantial reputation since.

2. Paintings by contemporaries of testatrix who enjoyed considerable reputation but who have failed to maintain their standing.

3. Older paintings of little artistic merit by artists who cannot be identified, or which are merely "attributed" to a particular school.

4. Minor works by important artists.

5. Paintings attributed erroneously to specific artists, where the quality of the painting is below museum standards.

6. Fakes or forgeries.

7. "Practice pieces" or "student works" by well-known artists.

8. Paintings which are too small to illustrate adequately the work of a given artist for museum purposes, or which are too large for their artistic importance.

It is common knowledge in the community that during the past 25 years public interest in the Wilstach collection has rapidly declined and that fewer persons visited Memorial Hall each year. This was one of the principal reasons for discontinuing the exhibition of the collection in Memorial Hall and transferring it to

the Art Museum. It seems inevitable that there will be a complete failure of testatrix's lofty purpose, if the Wilstach Collection is permitted to continue in its present milieu. An enlightened and informed public will not take the time to patronize inferior or mediocre paintings.

The Philadelphia Museum of Art is one of the finest institutions of its kind in the country. The paintings and other objets d'art on display there are increasing in importance each year. It would be a definite step backward to attempt to display insignificant or worthless items in this great museum.

The auditing judge has made this extended statement, which admittedly is purely dictum, because we are dealing with a public charitable trust and the trustees, the Commissioners of Fairmount Park, are all outstanding citizens of the community who devote themselves to their responsibilities unselfishly and gratuitously. The present commissioners, as well as the directors of the Philadelphia Museum of Art, are to be highly commended for the spendid manner in which they are performing their public duties.

### Losses on Investments

Although testatrix died in 1892, the present account is the first one filed in this case.

The original principal awarded to the trustees was valued at $523,696. Except for approximately $30,-000 in cash, this was composed entirely of securities owned by testatrix. Additional distributions from the estate over a period of years, plus transfers from income to amortize premiums on investments, increased the principal account to $625,659.

The loss of approximately $123,000, to which our attention was directed at this audit, was sustained when these assets were converted.

The account reveals that these losses were sustained partly by reason of retention by incumbent commis-

sioners, prior to 1914, of nonlegal securities forming part of decedent's estate at the date of her death and partly from nonlegal investments purchased in the early days of the trust. Most of the securities involved were issues of street railway companies which were prosperous and whose securities were highly favored investments before the advent of the automobile.

The powers of the trustee with respect to investments are found in the following language contained in the seventh codicil:

". . . And I direct my Executors to transfer to the Commissioners of Fairmount Park, in like manner in Trust, the one other fourth part of the residue and remainder of the said estate and estates, which said sum shall be invested in good and lawful securities by the said Commissioners of Fairmount Park."

It is obvious that the commissioners holding office in the early days of this trust misconstrued their powers with respect to investments. This is difficult to comprehend as it appears that the illustrious John G. Johnson, who was a legendary figure at the American bar, and Edward T. Stotesbury, one of the country's greatest financiers, were dominant members of the commission at the time and assumed active responsibility for the management of the investment portfolio.

On March 9, 1914, George Wharton Pepper, as counsel for the commission, submitted a written opinion, a copy of which is attached to the record, in which he stated:

"In my opinion there is nothing in the Wilstach will which authorizes the Commissioners of Fairmount Park to invest the estate in anything other than 'legal investments'."

There can be no doubt concerning the correctness of this opinion which has been faithfully observed by the commissioners. No nonlegal securities have been

purchased in the 40 years which have elapsed since it was rendered.

In 1939 Mr. Montgomery, the present attorney for the commission, was asked for his advice with respect ". . . to the disposition of the so-called non-legal securities held in trust, the investments of which are governed by the statutes relating to legal investments for a trust fund."

In a written opinion, dated October 7, 1939, a copy of which is attached to the record in this case, Mr. Montgomery stated:

"Such nonlegal securities should be sold by you as soon as you can do so consistently with sound business practice . . .

"When I say that nonlegal securities should be disposed of, I do not mean they should be needlessly sacrificed. On the other hand, they should not be held for an indefinite period of time. Each security should be carefully considered by you, both in the light of market conditions for that particular security and in the light of market conditions generally . . ."

A memorandum showing the transactions with reference to the disposition of the nonlegal securities purchased prior to 1914 and retained subsequent to 1939, was introduced in evidence. This exhibit discloses that the commissioners have heeded Mr. Montgomery's advice, which was unquestionably sound, and that these securities, with one exception, were all sold at substantially higher prices than prevailed in 1939 and that the net result to the estate was advantageous.

The commissioners who have held office since 1939 have performed their duties in a most praiseworthy manner and are especially to be commended for the manner in which they have disposed of the nonlegal investments which they have inherited from their predecessors.

Moreover, the present administration of this trust

would meet the most exacting standards imposed on testamentary trustees. Only securities approved by law for investment of trust funds by fiduciaries are being purchased. Jay Cooke, a highly regarded financial expert, who has had many years of experience in the banking and brokerage business, is treasurer of the commission. The purchase and sale of all securities is supervised by a special committee, of which Mr. Cooke is a member. The committee keeps full minutes of its deliberations and reviews the trust portfolio at frequent intervals. Experts in various branches of the investment business are invited to sit with the committee. Between meetings the list of investments held by the estate is submitted to various investment bankers, for review and suggestions. All of the securities are presently held by the Philadelphia National Bank, as custodian. Unquestionably, the trust assets are being administered, today, in a most satisfactory manner.

What about the question of the liability of the present commissioners for the management of the trust prior to 1914? Many changes have occurred in the roster of Commissioners of Fairmount Park since the inception of the trust. What duty is imposed upon a new commissioner to investigate the actions of his predecessors in office?

In connection with this question Mr. Montgomery placed in evidence tables containing the names of all of the commissioners who have served since 1894. Not a single member of the commission holding office in 1914 is alive todoay. Of the present commissioners, the oldest in point of years of service are Charles I. Thompson and John B. Kelly, who were both appointed on November 10, 1938.

Although it appears that some of the present commissioners have made an exhaustive study of the manner in which this trust was administered by the

commissioners who preceded them in office, in the opinion of the auditing judge no duty is imposed on a commissioner to make an extensive inquiry into the conduct of his predecessors, unless he has actual notice of losses incurred by the trust as a result of misconduct or gross negligence. He has a right to assume that the affairs of the commission have been properly handled and, if mismanagement occurred, that the officials of the city or State would have taken necessary steps to correct abuse and to enforce any liability incurred by a wrongdoer.

A further question presents itself. If the tenure of office of a commissioner terminates by reason of his death, or in any other manner, is it necessary to file accounts in all of the trust estates administered by the commission in order to release him or his estate from liability?

The legal relationship of an individual commissioner to the trust estate is different from that of the ordinary individual fiduciary. Members of boards or commissions, created by legislative fiat, performing governmental functions, are not fiduciaries within the meaning of section 102(3) of the Fiduciaries Act of 1949, or any similar statutes which have been in effect in this State. The actual trustee of the Wilstach estate is the City of Philadelphia, a municipal corporation, acting through the Fairmount Park Commission. Similarly, the individual members of the Board of City Trusts are not trustees of the estate of Stephen Girard, and the other trust estates which the board administers. The trustee, in those cases, is also the City of Philadelphia. This would appear to be equally true with respect to the officers and directors of eleemosynary institutions.

The auditing judge is therefore of the opinion that it is not necessary to file accounts in trust estates under the supervision of the commission every time a com-

missioner dies, or terminates his tenure of office, unless the remaining commissioners have actual knowledge of fraud or misconduct for which such former commissioner might be held responsible. Even in such cases, it may not be necessary to file accounts if some other means of enforcing the liability is available.

Since the City of Philadelphia, and not the individual commissioner, is the trustee, a change in the personnel of the commissioners would have no more effect upon the administration of trusts under the commission's supervision than in the case of the death or resignation of officers or directors of corporate fiduciaries or eleemosynary institutions. It would therefore seem that estates of deceased commissioners may properly be distributed without requiring a prior accounting and discharge in estates such as this, over which the commission has supervision or management.

The combined balance of principal, consisting of securities, paintings and objects of art, is $673,467.31.

The combined balance of income, consisting of securities, paintings and objects of art, is $985,960.68; which balances, together with any further income or interest on deposits, are awarded to the City of Philadelphia, acting by and through the Fairmount Park Commission, in trust for the uses and purposes declared by the will of testatrix and in accordance with the directions contained in this adjudication.

Leave is granted to the accountant to make all transfers and assignments necessary to effect distribution in accordance with this adjudication.

The certificate of the official examiner as to the award to the accountant in trust will be produced to the auditing judge in accordance with the provisions of the rule of court.

And now, October 9, 1954, the account is confirmed nisi.