**Jessup Estate**

2

Before Klein, Adm. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

*J. Peter Williams* and *Drinker, Biddle & Reath,* for exceptants.

*Guy T. Moore, William H. S. Wells* and *Saul, Ewing, Remick & Saul,* contra.

BOLGER, J., January 21, 1969.—Augustus E. Jessup died August 16, 1925, leaving a will which was duly probated.

Under and by virtue of the terms of a certain indenture of marriage settlement dated June 10, 1890, certain assets were conveyed to the trustees named in the deed and there was reserved to the settlor, Augustus E. Jessup, the right to appoint the principal of the fund upon the death of himself and his wife, the former Lady Mildred Bowes Lyon. By the second paragraph of his will the decedent exercised his power of appointment (his first wife having died) and provided that the remainder of the fund should be divided into thirty equal parts or shares, the same to be held in trust as follows:

"Ten (10) of such parts or shares for the benefit of my son Alfred C. Jessup; five (5) shares for the benefit of my son Alexander M. Jessup; five (5) shares for the benefit of my daughter Olive C. L. Jessup; five (5) shares for the benefit of my daughter Mary V. Jessup, and five (5) shares for the benefit of my wife Jenny J. Shaw, under separate trusts, to pay over the income therefrom unto my said wife and children by any previous marriage respectively for life. In Trust, upon the death of each child, to assign, transfer, pay over and divide the principal of such share to and among his or her children, or the issue of deceased children, share and share alike, per stirpes, upon the principle of representation. In Trust, upon the death

of any child without leaving children or issue him or her surviving, to divide the share of the child so dying among the other hereinbefore mentioned beneficiaries under this my Will in the same proportion as each share bears to the whole, less the share of the child so dying, and to hold the same under the same uses, trusts, contingencies and remainders hereinabove set forth;

"And for my wife, in Trust for her life, and likewise for any legitimate issues of my present marriage, who may attain to twenty-one years of age and obtain a vested interest, And failing either of these contingencies the said share shall be equally divided between the hereinbefore mentioned and surviving beneficiaries under this my Will."

At the time of the death of Augustus E. Jessup, his two sons, Alfred C. Jessup and Alexander M. Jessup, his two daughters Olive C. L. Jessup, later Howell, and Mary V. Jessup, later Hood, and his wife, Jenny, were living, and the trusts were established including the trust for Jenny J. Shaw, later Nunes de Sa. She died January 14, 1968, a resident of Gloucestershire, United Kingdom, leaving a last will and testament dated November 7, 1957, on which letters testamentary were granted to Westminster Bank, Ltd., of London.

Alfred C. Jessup died December 8, 1953, and Alexander M. Jessup died March 23, 1931. It is stated that Girard Trust Bank is the executor of their respective estates. Olive Jessup Howell and Mary Jessup Hood survive and are sui juris.

No issue was born as a result of the marriage of testator and Jenny J. Shaw.

The question to be determined is the meaning of the words used by testator to describe the distribution he intended after the death of his wife without leaving issue born of their marriage then living. In

that event he stated ". . . the said share shall be equally divided between the hereinbefore mentioned and surviving beneficiaries under this my Will."

The "hereinbefore mentioned" beneficiaries clearly refers to testator's four children named in the preceding paragraph of the will. What is the meaning of the word "surviving"? The cases are clear that absent a contrary intention plainly manifested by the will, "surviving" is to be construed as referring to the death of testator and not of the life tenant: Hope Estate, 398 Pa. 470 (1960). This rule of construction is an application of the general rule that an interest is to be construed contingent only when it is impossible to construe it to be vested.

Counsel for Mary Jessup Hood contends that testator has manifested an obvious intent that the remainder interests are contingent. While the language of the will is not entirely clear and while it is possible to so construe it, such uncertainty is not sufficient. Where the meaning is vague, a remainder will be construed as vested rather than contingent; what is required is not that the words admit of a possible or even reasonable inference that the testator intended a contingent remainder, but that such intention should appear plainly, manifestly and indisputably, otherwise the estate is always held to be vested: Bomberger Estate, 347 Pa. 465 (1943); cf. 6 Hunter, Penna. Orphans' Court, Vested and Contingent Interests §1(a). And the presumption applies with greater force when provision is made for a child or grandchild: Brumbach Estate, 373 Pa. 302 (1953).

These presumptions, then, fall only in the face of clear evidence of an intention that the remainder be contingent. We find no such clear evidence with respect to testator's children. There is evidence in the will to the contrary. Testator knew how to create contingent interests, for in the preceding paragraph of his will he provided that upon the death of a child "with-

out leaving issue him or her surviving" the remainder pass to the trusts created for the other named beneficiaries. The only conclusion which can be drawn from the lack of a similar provision in the language under consideration is that testator did not intend the remainder to be contingent: See Handy's Estate, 314 Pa. 61 (1934), where under similar facts the same conclusion was reached.

We believe, however, and so hold that testator did not intend his wife's estate, should she die without children born of their marriage, to share in the principal of the trust set aside for her benefit during her life. Testator specifically and in two places limited any interest of his wife in this trust or the trusts set aside for his children for her life. It is anomalous to construe this will in such a way that she has an interest in principal. Whatever testator meant by the language he used he clearly intended his wife to have only an interest in the income of her trust.

We are satisfied that the Act of June 29, 1923, P. L. 914, now incorporated in section 14(4) of the Wills Act of April 24, 1947, P. L. 89, has no application to the present controversy: Clemson Estate, 17 D. & C. 2d 679 (Orph. Ct. Allegheny 1959).

And now, January 21, 1969, the account is confirmed nisi.

OPINION SUR EXCEPTIONS TO ADJUDICATION

KLEIN, Adm. J., October 23, 1969.—The question of whether a gift should be construed as vested or contingent has plagued probate courts for countless years. However, in order to confirm title to property at the earliest possible time and to make it more readily marketable, the courts have always favored vested estates.

In Newlin Estate, 367 Pa. 527, 534, Mr. Justice Bell (now Chief Justice) succinctly summarized the law on the subject in the following language:

"Moreover, if it is not clear from the language of the will whether the remainder is vested or contingent, then as Mr. Justice Linn said in Weir's Estate, 307 Pa. 461, 468, 469, 161 A. 730, 'it is necessary to keep in mind the rule "that an interest is to be construed contingent *only when it is impossible to construe it as vested"*: Rau's Est., 254 Pa. 464, 98 Atl. 1068; that the intention to create a contingent interest *"should appear plainly, manifestly and indisputably:"* McCauley's Est., 257 Pa. 377, 101 Atl. 827 . . . In Marshall's Est., supra, it is said: "The law leans to vested rather than to contingent estates, and the presumption is that a legacy is vested: Carstensen's Est., 196 Pa. 325 [46 Atl. 495]; Tatham's Est., 250 Pa. 269 [95 Atl. 520]; Neel's Est., 252 Pa. 394 [97 Atl. 502]; Rau's Est. [supra]; and *'the presumption that a legacy was intended to be vested, applies, with far greater force, where a testator is making provision for a child or a grandchild, than where the gift is to a stranger or to a collateral relative:'* Wengerd's Est. 143 Pa. 615 [22 Atl. 869]."' See to the same effect: Groninger's Estate, 268 Pa. 184, 189, 110 A. 465."

In Houston Estate, 414 Pa. 579 (1964), also written by Chief Justice Bell, the Supreme Court reaffirmed these principles but modified the rule that an interest is to be construed contingent only when it is impossible to construe as vested to be that *"the intention of a testator or settlor to create a contingent interest must appear clearly and plainly."* (Italics supplied.) The reason for the modification of the rule is set forth in a footnote on page 594:

"Several cases state that an interest will not be construed to be contingent unless it is *impossible* to construe it as vested. The word 'impossible' is an unfortunate expression, as many people believe that nothing is impossible. Several other cases use the expression 'clear, plain and manifest' while others

use 'clear, plain and indisputably' or 'indisputable.' However, we believe that it is fair and correct to say that an analysis of these authorities discloses an intention in each of the prior cases to express the same meaning, albeit in different language. The variety of language used to express this test has caused such confusion that we deem it wise to herein use and apply the test hereinabove set forth in this opinion, since it appears to be the fairest and most correct test."

If anything is clear in the present case, it is that it does not appear *clearly* and *plainly* that testator intended to create a contingent interest. We, therefore, agree with the conclusions of the auditing judge that the interests of testator's four children, all of whom survived him, are vested.

The auditing judge also held that the interest of testator's widow, Jennie T. Shaw Jessup, later Jenny Nunes de Sa, who was his third wife, in the remainder of the fund upon which she received income for life, was contingent and not vested. We make no comment concerning this ruling as no exceptions were filed thereto.

Accordingly, the exceptions are dismissed and the adjudication is confirmed absolutely.

### SUR EXCEPTIONS TO ADJUDICATION

LEFEVER, J., October 23, 1969.—

#### *Concurring*

As well stated in the majority opinion, "The question of whether a gift should be construed as vested or contingent has plagued probate courts for countless years." During most of those years, there existed in Pennsylvania two conflicting and contrasting canons of construction which were applied to fit the particular case before the court in determining whether the disputed gift was vested or contingent,

namely: (1) the "pay and divide" rule, viz. where the gift in remainder is necessarily implied solely because of a direction in the trust instrument "to convey, transfer, assign and pay over" the gift is deemed to be contingent; and (2) the "presumption of vesting" rule, viz. a gift is to be construed as contingent only when it is impossible to construe it to be vested.

The "pay and divide" rule had its genesis in the ancient case of Moore v. Smith, 9 Watts 403, 407, wherein it was stated: ". . . where there is no separate and antecedent gift which is independent of the direction and time for payment, the legacy is contingent; and it seems to be as well founded in reason, as rules of interpretation usually are. Where a gift is only implied from a direction to pay, it is necessarily inseparable from the direction, and must partake of its quality; insomuch that if the one is future and contingent, so must the other be": Edmunds Estate, 374 Pa. 22; Wilson Estate, 369 Pa. 583. This rule was much criticized[1] and in 1959 it was abolished: Dickson Estate, 396 Pa. 371, 374.

---

[1] In his concurring opinion in Edmunds Estate, supra, pages 26 and 27, Mr. Justice (now Chief Justice) Bell stated: ". . . How tenuous is the reed upon which the ancient and admirably phrased 'Pay and Divide' Rule (justifying holding gifts to be contingent) is built is clearly apparent (1) from the fact that if the scrivener of a will uses, after a life estate, the words 'I give and bequeath the principal' instead of the words 'to transfer, pay and distribute the principal' which have exactly the same meaning, the rule does not apply; and (2) because the cases applying the rule are almost equally divided as to whether and when the general rule or its exception applies,* and are '. . . difficult, if not impossible, to harmonize or reconcile . . .': Newlin Estate, 367 Pa. 527, 536, 80 A.2d 819; Alburger's Estate (No. 2), 274 Pa. 15, 117 A. 452; Hood's Estate, 323 Pa. 253, 259, 186 A. 740; Rickenbach Estate, 348 Pa. 121, 125, 34 A.2d 527; Wilson Estate, 369 Pa. 583, 587, 87 A.2d 648; and (3) because the rule flies in the face of well and wisely established principles (a) that the law favors

The majority opinion in the instant case is grounded squarely upon the application of the second canon of construction above-mentioned, viz. the presumption of vested gifts.[2]

---

vested rather than contingent estates and the intention to create a contingent estate must plainly appear, and (b) that an heir is not to be disinherited except by clear language or by necessary implication: Newlin Estate, 367 Pa., supra, 527, 534, and many cases therein cited."

---

*"Many examples of apparently contrary applications of the rule are cited or quoted in Newlin Estate, 367 Pa., supra, where we said, inter alia (p. 536): '. . . "As long ago as McClure's Appeal, 72 Pa. 414, we pointed out (p. 418): 'Though there be no other gift than in the direction to pay or distribute in futuro, *yet if such gift or distribution appears to be postponed for the convenience of the fund or property, or where the gift is only postponed to let in some other interest,* the vesting will not be deferred till the period in question.' Here there can be no question that the gift was postponed to enable the widow to enjoy the income from the estate during her life." . . .' "

---

And in Dickson Estate, 396 Pa. 371, 374, Mr. Justice Bell stated: "Whatever may have been the justification for the origin of this judically created technical Rule, it has vanished, leaving in its wake a welter of conflict and confusion."

The writer of the present concurring opinion expressed similar criticism in his opinion for a unanimous Philadelphia Orphans' Court in Dickson Estate, 14 D. & C. 2d 741, 745 viz., "Exceptant urges that under the 'pay and divide' rule our conclusion should be otherwise. However, as we have heretofore said: 'In view of the difficulties involved in the application of the "pay and divide" rule, we will not resort to it unless absolutely necessary. Here testatrix's clear intention governs.' Krug Estate, 86 D. & C. 436, 439. See Bald Estate, 385 Pa. 176, 181."

---

[2] The majority opinion applies this canon, as modified in Houston Estate, 414 Pa. 579, 594, viz. "the intention of the testator to create a contingent interest must appear clearly and plainly."

It is significant that classic "pay and divide" language is present in the crucial "Second" paragraph of the instant will, which creates the gift here at issue, viz.:

". . . In Trust, upon the death of each child, to assign, transfer, pay over and divide the principal of such share to and among his or her children, or the issue of deceased children, share and share alike, per stirpes, upon the principle of representation; In Trust, upon the death of any child without leaving children or issue him or her surviving, to divide the share of the child so dying among the other hereinbefore mentioned beneficiaries under this my Will. . .

"And for my wife, in Trust for her life, and likewise for any legitimate issues of my present marriage, who may attain to twenty-one years of age and obtain a vested interest, And failing either of these contingencies the said share shall be equally divided between the hereinbefore mentioned and surviving beneficiaries under this my Will."

It follows that if the "pay and divide" rule were still in force and effect, the gifts at issue in the instant case should be construed to be contingent and should be distributed only among the two children living at the death of testator's wife, the life tenant.

Concededly, as noted, supra, the "pay and divide" rule produced "a welter of conflicting confusion" and in many instances produced anomalous results. Nonetheless, it was a true counterweight to the equally harsh, unrealistic and anomalous rule that a gift must be presumed to be vested unless the intention of testator or settlor to create a contingent interest was clear and plain. Consequently, the abrogation of the "pay and divide" rule in 1959 has produced results not readily then foreseen.[3] Thus, in many close and doubtful cases which have arisen

---

[3] At least by the writer of this opinion.

since 1959 the courts have been compelled to decide that gifts were vested in beneficiaries long since dead, with the accompanying unrealistic results that (1) many estates had to be reopened and distribution made through them, successively; (2) the awards were successively subjected to additional administrative expenses and huge Federal estate taxes and Pennsylvania inheritance taxes; and (3) the persons who ultimately received the awards were complete strangers to testator and not in his bloodline. Such unrealistic and unfortunate results will ensue from the decision of the majority in the instant case.

It is my view that the result reached by Judge Shoyer in his dissenting opinion in the instant case is fairer and more realistic than that accomplished by the majority. However, the authorities cited in the majority opinion are in point and binding upon this court. Hence, I reluctantly concur therein.

On occasion, however, the Supreme Court has been receptive to suggestions contained in majority or dissenting opinions of this court, e.g., Catherwood Estate, 405 Pa. 61, and Ehret Estate, 427 Pa. 584. I respectfully submit that the canons for construction of vested and contingent remainders would bear reexamination in the light of the abolition of the counterbalancing "pay and divide" rule and that a more equitable and realistic doctrine should be adopted.

Judges Saylor and Burke join in this concurring opinion.

SUR EXCEPTIONS TO ADJUDICATION
SHOYER, J., October 23, 1969.—

*Dissenting*

I dissent because I believe that my colleagues should have searched a little harder—a little longer—for the

testator's intent,* and, furthermore, any lingering doubt as to his meaning is removed by application of the Act of 1923.

Bearing in mind that our never ceasing duty is to ascertain testator's intent, which is the pole star of construction, I am convinced after examination of this will from all four corners that testator used surviving in the sense of outliving the life tenant. " 'The question in expounding a will is not what the testator meant, but what is the meaning of his words.' But by this it was never intended to say that the testator's

---

*At the audit before Judge Bolger, the two living remaindermen sought to establish their father's testamentary intent through the "armchair method." To avoid the established case law in Pennsylvania that "surviving" relates to the death of testator rather than the death of the life tenant, they offered proof that (a) the will was drafted by a British solicitor or (b) by their father, a layman, who probably had access to a mass of legal documents—wills, agreements, settlements—from the estate of his father, Alfred Dupont Jessup, who died in 1881. On objection, the learned auditing judge excluded the tendered proof as hearsay.

There is evidence in the record which is well-nigh conclusive, however, that the scrivener was not a Pennsylvania lawyer. First, there is the stipulation that testator's Pennsylvania counsel, a leading Philadelphia law firm, does not know who prepared the will which was executed by Mr. Jessup in Leghorn, Italy, on April 14, 1925. Secondly, the language of the will itself indicates that it was prepared by someone who was familiar with the special language of English wills, but was certainly not an expert draftsman, e.g., writing "trustees" and "annuities" (items third and fourth) when there was but one trustee and a single annuity, and referring in terrorem (item thirteenth) to a beneficiary's "disputing" rather than contesting the will. The scrivener also described the rule against perpetuities as "the statute of limitations" (item seventh), which is reminiscent of the language of Fearne writing on "contingent remainders" (10th edition) in 1776, or the early technical meaning of "perpetuity" as "a limitation equivalent to, or in the nature of, an unbarrable entail": see 1 Jarman on Wills (7th ed. 1930) p. 255.

meaning when apparent can be disregarded, but, that it cannot be got at aliunde, by what he might have meant, or even what under the circumstances perhaps he would have meant, but only by what he said. The search is confined to his language, but its object is still his meaning": Woelpper's Appeal, 126 Pa. 562, 572. We are not to be blinded by canons of construction nor to apply them "until all reasonable effort to deduce a meaning from the writing itself has been exhausted with no understandable and sensible result": Buzby Estate, 386 Pa. 1, 8. We have been warned by our former colleague, the late Mr. Justice Ladner, that "the danger of such rules of construction is their tendency in the progress of time to become inflexible and in their application to circumstances where there is neither reason nor necessity until finally they become controlling": Earle Estate, 369 Pa. 52, 59.

Every orphans' court judge knows that the use of the word "surviving" by countless testators over past centuries has invariably resulted in legal contests whenever the scrivener has failed to nail down the "whom" whose death is to determine the remaindermen. In the leading case of Ross v. Drake, 37 Pa. 373 (1860), our Pennsylvania Supreme Court refused to follow the English landmark case of Cripps v. Wolcott, 4 Mad. 11 (1819), which held "there being no special intent to be found in the Will, the terms of Survivorship are to be referred to the death of the" life tenant. The contrary Pennsylvania rule is that in the absence of controlling evidence of a different intention, reference is to the death of testator.

In the experience of the late Judge Gest, who was renowned as an Orphans' Court constructionist, the proper interpretation of survivor, when not clearly indicated by the testator, "is always debatable": Craig's Estate, 24 Dist. R. 851, 853. And the learned jurist reminded us in the same opinion (p. 854) that

we should keep in mind the two reasons on which the Pennsylvania canon is founded—"first, that in the majority of cases it avoids the disherison of issue of the first takers, and thus effectuates what in general may be presumed to be the testator's intention; and, secondly, in some cases it avoids intestacy." A majority of this court agreed with Judge Gest "that neither of these reasons [had] any place" in the situation as it existed in Craig Estate, and I believe the same is true here. Certainly the scrivener of this will, whether layman or lawyer—and it does not matter which—was not familiar with the Pennsylvania rule, and did not use "surviving" in its technical sense: Shaffer's Estate, 262 Pa. 15, 19.

In item second of his will of April 14, 1925, Augustus Jessup exercised the power of appointment reserved under his own deed of marriage settlement dated June 10, 1890. He gave the residue to his trustees to divide into 30 equal shares, 10 of which were for benefit of his oldest son, Alfred, the remaining 20 shares in lots of five shares for each of his other three named children and his third wife, Jenny. Then "In Trust, upon the death of each child, to assign, transfer, pay over and divide the principal of such share to and among his or her children, or the issue of deceased children, share and share alike, per stirpes, upon the principle of representation: In Trust, upon the death of any child without leaving children or issue him or her surviving, to divide the share of the child so dying among the other hereinbefore mentioned beneficiaries under this my Will in the same proportion as each share bears to the whole, less the share of the child so dying, and to hold the same under the same uses, trusts, contingencies and remainders hereinabove set forth:

"And for my wife, in Trust for her life, and likewise for any ligitimate [sic] issues of my present mar-

riage, who may attain to twenty-one years of age and obtain a vested interest, And failing either of these contingencies the said share shall be equally divided between the hereinbefore mentioned and surviving beneficiaries under this my Will."

It is crystal clear that the gifts for his four named children were of the income only for their respective lives, the principal to their *living* children or issue. It is equally clear that if upon the death of any child there was a definite failure of issue, the estate of the deceased child was not to share in the income from that share which was to be divided and held in trust "among the other hereinbefore mentioned beneficiaries under this my will in the same proportion as each share bears to the whole, less the share of the child so dying," e.g., Albert's share would go five-twentieths to each of the others, and so on. Testator's intention of keeping principal within his blood line is evident, whether a child should die with or without issue, and to further this purpose his scheme to postpone vesting to *living* grandchildren or their issue *only*, is apparent.

In his gift of the remainder upon the death of a named child without issue, testator makes the award to the "other hereinbefore mentioned beneficiaries." By this expression he has included not only his wife and children (who were specifically named earlier in this paragraph) but also *all* possible remaindermen who are to take when a child dies *with* issue. As stated in the preceding sentence, the gift in such latter event is to "his or her children, or the issue of deceased children, share and share alike, per stirpes, upon the principle of representation."

Had testator said "hereinbefore *named* beneficiaries" his reference would be limited to those specifically identified by name, viz., his four children and his wife. But "mentioned" is a broader term and the word

includes, in addition to named persons, all those referred to and identified as a group or class without attempting to name the individual members.

Augustus Jessup used the word "surviving" in three places. His first use in the first paragraph of item "Second", as quoted above, makes clear reference to the death of his children and descent of their interest upon failure of issue, i.e., "upon the death of any child without leaving children or issue him or her surviving . . ." Unmistakably the situation as it exists upon the death of a *child*, not the death of the testator himself, is meant. Where contingency is expressed so clearly and unequivocally we need not concern ourselves with a possible intestacy. Faced with the same question in Woelpper's Appeal, supra, Mr. Justice Mitchell answered (p. 571) that "where the rest of the fee is, whether in nubibus, or in gremio legis, as the early lawyers called it, or in reversion in the heirs of the testator, as Fearne maintains (2 Sharswood's Blackstone, 107 n.), is not a practical question which we need discuss here."

Again testator makes use of "surviving" in item "Seventh" which reads as follows:

"SEVENTH—I desire that any of my children shall possess the right of willing his or her share above mentioned during their lifetime to their wife or husband for life whether they predecease me or not. With the exception of my eldest son Alfred C. Jessup who in the event of his dying childless shall only leave half the life interest on his major share to his wife the other half to be divided equally between the surviving beneficiaries under this my will in the event of his having no child or children who live to take a vested interest. Only the children of my children who shall attain the age of 21 years and take a vested interest shall be eligible to the benefits of this my will provided

this in no way runs contrary to the Statute of Limitations."

By use of capitals and periods, item Seventh is divided into three sentences. The second sentence is actually a dependent clause of the first sentence, however, because it depends on the first to complete its meaning and is incomplete without it. Thus read, it becomes apparent that item Seventh refers to distribution of testator's marriage settlement property as well as his "own personal estate." * "Surviving beneficiaries under this my will" and "the benefits of this my will," confirm this meaning. Counsel for the estates of the two sons concede that this modifies the scheme of distribution in item Second but only as a "temporary exception." Closer analysis must determine that the permissive grant of a life estate to a surviving spouse whether a child "predecease me or not" is a definite and permanent alteration of the dispositions in both items Second and Fifth. The power to will a life estate to a surviving spouse in either event, and whether or not the legatee was survived by children, is strong evidence that testator did not look upon survivorship as predetermined by rule of law or as merely automatic. The second clause limiting Alfred's power to so direct one half and bequeathing the other one half to "the surviving beneficiaries" in the event none of Alfred's children reached age twenty-one must mean beneficiaries *surviving Alfred*. If read as "surviving" testator, Alfred's estate would take even though he died after testator without children or widow to whom distribution could be made as expressly authorized by testator, and thus Alfred's share could be directed outside the blood line which is at variance with testator's

---

*Testator's personal estate was insolvent at time of his death six months later, on October 16, 1925.

wishes as expressed elsewhere in item Second and here.

So also the requirement that vesting in "children of my children" must be postponed until age 21, refutes any possible thought that testator contemplated vesting as occurring immediately upon, and as early as, his own death.

Coming now to testator's third use of "surviving" which gives rise to the present controversy, we gather convincing evidence as to testator's intended use from the meaning which he has given the word in the other two places.* "Hereinbefore mentioned and surviving beneficiaries" as used in the last paragraph of item Second inevitably means the beneficiaries mentioned in the preceding paragraph of the will *who survived the widow.* Any other construction would be in such striking contrast to testator's use of the word elsewhere that we are rhetorically repelled by any such interpretation. Testator having clearly and conclusively established a preference for descent along blood lines for his children's trusts has schematically continued such dispositive preference for the remainder of his wife's trust in the event she should die without issue living to obtain a vested interest. Testator has expressed his intention as to his wife's trust in a condensation or sort of shorthand of what he has spelled out at length in his preceding paragraph. His use of "likewise" sets up a trust for any issue that might be born to him by his wife Jennie. Such issue would obtain a vested interest upon reaching age 21 and would then receive principal. In the absence of any such issue, or upon failure of such issue to reach age 21, he imposes no additional trust

---

*In Castledon v. Turner, 3 Atkyn's Rep. 257, the Court of Chancery held that the uncertain and ambiguous use of the personal pronoun "her" was made certain by its unequivocal use in two other places in the will.

upon the principal but directs its equal division between the beneficiaries mentioned in the preceding paragraph who should survive his widow. Testator's omission of any continuation of the trust as in the preceding paragraph is intentional, lucid and perspicuous. His omission of any express exclusion of his wife's estate from participating in the principal, but relying instead on "surviving beneficiaries" in lieu of the longer phraseology is also understandable.

The intent and purpose of Augustus Jessup as clearly expressed in detail in the first quoted paragraph of item Second and in item Seventh must carry over as to his wife's trust in the absence of some convincing evidence that he did not so intend. Faced with the identical problem, and construing language even less explicit, in Dinkey Estate, 403 Pa. 179, 183, our Supreme Court reasoned that "we cannot read or consider the first dispositive clause or provision in the third paragraph without reading and considering it in connection with and together with the second dispositive clause or provision of the third paragraph. Considering the two together, the testator's intention is, we repeat, clear that Alva, Jr. could take one-third of the principal of the trust only if he survived testator's widow."

I agree with the learned auditing judge that it would be "anomalous" for the widow's estate to receive a share of her trust principal. I do not see how my brethren can logically exclude her, however, and at the same time include the estates of the two sons who, like her, survived testator. The majority opinion avoids this issue by refusing comment.

There is another and no less compelling reason for referring survivorship to the death of the widow. By the Act of June 29, 1923, P. L. 914, it was provided that in interpreting the wills of persons dying after December 31, 1923, where property is left in trust, for

use of any person for life with a vesting of the remainder upon termination of the life estate, in the testator's heirs, next of kin, children,* etc., i.e., "the persons thereunto entitled under the intestate laws, or other similar or *equivalent phrase*," such provision shall be construed as meaning "the persons thereunto entitled at the time of the termination of the estate . . . for life . . . under the intestate laws of the Commonwealth as they shall exist at the time of such termination; and *such phrases* shall not be construed as meaning the person or persons who were the heirs or next of kin of the donor at the time . . . testator died." (Italics supplied.)

In Laughlin's Estate, 336 Pa. 529, 536, our unanimous Supreme Court stated that this act was "a legislative establishment of a statutory presumption, and it is reasonable to believe that this presumption is 'a conclusion firmly based upon the generally known results of wide human experience'": Love Estate, 362 Pa. 105, 107, repeated the court's approval of this conclusion. Similarly Jarman in referring to the holding of Sir John Leach in Cripps v. Wolcott which conclusively established the rule in England with regard to personal property, commented "the rule of construction which he propounded, seems to be so reasonable and convenient for general application, that it is not surprising that subsequent Judges have been favorably disposed *to its adoption*": 3 Jarman on Wills, 7th ed., 1930, p. 2064.

The above authorities are reason enough to hold that the Act of 1923 should be given a broad, not a narrow, interpretation. As confirmation of this we turn to the Wills Act of April 24, 1947, supra, sec. 14(4), and the comment of the Joint State Government Commission that this clause "is an extension of the Act

*"Children" is interpolated by Chief Justice Maxey in Laughlin's Estate, 336 Pa. 529, at page 536.

of 1923, P. L. 914, 21 PS §11, to include gifts in remainder to heirs of a person other than the testator. In all such cases *it is desirable to have the class determined as of the time the remainder falls in*, unless the testator directs otherwise." (Italics supplied.) This legislation has reversed Pennsylvania case law so that presumptively the remaindermen are to be determined at death of the life tenant instead of testator.

Here testator has used the expression "hereinbefore mentioned and surviving beneficiaries," which group at the time he wrote his will was composed inclusively of all his heirs and next of kin, and exclusively of all others. The mere fact that he first mentioned his children and wife individually by name cannot dispel the actuality that these persons as a group with "their children or the issue of deceased children" were then, and in the future would comprise, his heirs and next of kin. He has referred to them clearly and without ambiguity by an "equivalent phrase." We must interpret his language in the light of the circumstances in which he wrote, and the living kin who then surrounded him.

The Pennsylvania legislature did not insist that testator select a *synonym* for heir or next of kin for they well understood he would not be writing in a vacuum. The written instructions of a testator are "little more than a scrap of paper save as they operate with legal effect on matters extraneous to the will itself. Construction deals with the dynamic rather than the static phase of the instrument. The question is not just what words mean literally but how they are intended to operate practically on the subject-matter":* City of Marshall v. Gregoire, 193 Minn. 188, 198, 259 N.W. 377, 381.

For the above reasons I dissent from the action of my colleagues in dismissing the exceptions. I would

*The above quotation is a slight paraphrase of the original.

return the matter to the learned auditing judge for his further consideration not inconsistent with the views herein expressed. It seems to me on the basis of stipulated fact no. 7 and the family tree, that testator's grandson, Alexander A. Jessup, obtained a vested interest in his father's share prior to his death at age 22 years. Such vesting would entitle him to a subsequent cross-remainder: Hope Estate, 398 Pa. 470. Since the record is not explicit as to what notice was given to the personal representative of this grandson's estate, the matter should be returned for clarification.